537 F.2d 1222
 NORFOLK SHIPBUILDING & DRYDOCK CORPORATION, Appellee,
v.
M/V HARRY W. ADAMS, her engines, tackle, etc. in rem, et
al., Appellants.
NORFOLK SHIPBUILDING & DRYDOCK CORPORATION, Appellant,
v.
M/V HARRY W. ADAMS, her engines, tackle, etc. in rem, et
al., Appellees.
 Nos. 75-1859, 75-1860.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1976.
Decided June 14, 1976.
 
 G. W. Birkhead, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant in No. 75-1860 and appellee in No. 75-1859.
 Andrew S. Fine, Norfolk, Va. (Lewis Allen, Fine, Fine, Legum & Fine, Norfolk, Va., on brief), for appellant in No. 75-1859 and appellee in No. 75-1860.
 Before CRAVEN, FIELD and WIDENER, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 I.
 
 1
 Bound for Nova Scotia for repairs, the M. V. HARRY ADAMS encountered sudden, heavy squalls as she came around Cape Hatteras a week before Christmas 1973. She weathered the storm, but in bad condition, and was towed into Hampton Roads by the Coast Guard. When she tied up at Norfolk Shipbuilding and Drydock's wharf on December 18, 1973, there was a steady leak in the stern, and the ship was in danger of sinking.
 
 
 2
 Emergency repairs were essential and were completed within three weeks. The master, Captain Vinton Lloyd, testified that the leakage problem and loose caulking in the hull timbers were not attended to since it was decided that these repairs could await arrival in Nova Scotia. When the emergency repairs were completed, Captain Lloyd left the ship in charge of two crewmen, Parris and Wallet, with instructions to care for it and its equipment. Captain Lloyd did not return.
 
 
 3
 Norfolk officials contacted owner John Mosele in January concerning the past-due bill for the emergency repairs, asking him to remove the vessel, as Norfolk needed the 130 feet of pier space occupied by the HARRY ADAMS. Mosele failed to pay the bill, but in a spirit of accommodation, Norfolk did not press the matter, relying upon Mosele's representation that he would pay soon and sail the vessel away.
 
 
 4
 Meanwhile, things were not well in the HARRY ADAMS. Although Norfolk installed two pumps aboard the vessel, and it was checked regularly by yard watchmen, the ship continued to leak.
 
 
 5
 On March 21, 1974, Norfolk sent the following letter to the owner:
 
 Dear Mr. Mosele:
 
 6
 Confirming my telephone conversation of March 15, 1974, please make arrangements to move your vessel from our shipyard.
 
 
 7
 Beginning the week of March 24, 1974 we will charge storage at the rate of $25.00 per day until the vessel is moved.
 
 
 8
 We accept no responsibility for the vessel while it is in our yard and all charges against your vessel must be paid prior to departure from our shipyard.
 
 
 9
 Very truly yours,
 
 NORFOLK SHIPBUILDING & DRYDOCK CORPORATION
 Mosele responded on March 25 as follows:
 Dear Mr. Beard:
 
 10
 I appreciate your many considerations extended me.
 
 
 11
 When we talked last week, I mentioned to you that I would try to make provisions in the next 30 days to move the HARRY ADAMS or to make arrangements of some type. You mentioned that you might have a broker who could sell the vessel and you would have him get in touch with me.
 
 
 12
 I haven't been able to move the boat because I am still short of money, but things are very promising for funds in the next week or two.
 
 
 13
 Please, see if you can have the broker you mentioned get in touch with me. Can you possibly go along a short time longer without incurring costs on the vessel for storage. I am sure I can make arrangements very shortly to move or relocate. Thank you.
 
 
 14
 Yours very truly,
 
 John L. Mosele
 
 15
 Norfolk answered Mosele's letter on April 5, 1974, reiterating that storage charges at the rate of $25 per day were being charged as of March 24.
 
 
 16
 Sometime in June Parris was caught stealing equipment from the HARRY ADAMS and was arrested. Wallet had left in March, and Parris' misfortune left the ship unattended. Mosele had failed to make any settlement on his account despite mounting storage charges, and on July 12, 1974, Norfolk notified Mosele that unless payment in full was received within ten days, the matter would be turned over to its attorneys for collection.
 
 
 17
 On Monday, August 27, it was discovered that the HARRY ADAMS was partially submerged. Apparently the pumps placed on board by Norfolk had failed. The incident was immediately reported to Mosele, and Norfolk refloated the vessel and made emergency repairs to the electrical system and other machinery. The HARRY ADAMS thereafter remained afloat without further incident.
 
 
 18
 Having received no payment against its account, Norfolk filed suit in admiralty against the HARRY ADAMS in rem and against Mosele personally on September 17, 1974. The vessel was seized by the United States Marshal on September 18, and an interlocutory sale produced $2,100, less costs of sale, which is being held in escrow pending resolution of this appeal.
 
 
 19
 At trial, the district judge, sitting as an admiral,[1] dismissed both the complaint and the counterclaim, concluding, "I am leaving the parties where they were before they came into court, because I think both of them are guilty of negligence."II.
 
 
 20
 We first consider Norfolk's claim for emergency repairs to the HARRY ADAMS finished in January 1973 and for storage charges from the notice date of March 24 to August 27, 1974, the day the ship sank at Norfolk's pier. The district court ruled that Norfolk's negligence in permitting the vessel to sink precluded recovery. This is plain error.
 
 
 21
 The repairs, which were completed within three weeks of the ship's arrival, were performed pursuant to a written contract between Norfolk and the HARRY ADAMS. A copy was sent to Mosele, who indicated that he would be personally responsible for the bill. Mosele never complained about the amount of the bill or the quality of the workmanship. He simply did not pay. The same is true of the storage charges. Counsel for Mosele at oral argument candidly admitted that he could find no authority to support the district court's conclusion that subsequent negligence of a shipyard destroys a vessel owner's contract obligation to pay for repairs and dockage, and conceded that Norfolk is entitled to payment, at least until the sinking of the HARRY ADAMS. We agree. While subsequent events could possibly establish a setoff in Mosele's favor to be credited against the amount due, we hold that Norfolk is entitled to recover on remand whatever amount it can prove due for the December-January 1974 repairs and reasonable storage charges from March 24 to August 27, 1974.
 
 III.
 
 22
 Is Norfolk entitled to recover for dewatering, refloating, and repairing the HARRY ADAMS after she sank at Norfolk's pier on August 27 and for dockage until seized by the Marshal on September 18, 1974? The district court thought not. We hold otherwise.
 
 
 23
 The trial judge reasoned that a bailment for mutual benefit continued up to the date of the sinking, and that Norfolk "owed a duty in this instance to exercise reasonable care for the preservation of the vessel which was left in its charge." The district court felt that this duty had been breached by Norfolk's failure to check the ship's condition often enough and by the malfunctioning pumps installed by Norfolk to keep the vessel afloat. This negligence was held to prevent Norfolk's recovery of its costs in refloating and repairing water damage.
 
 
 24
 We believe that Norfolk's letter of March 21 and Mosele's neglect of his vessel after receiving that letter effectively terminated the bailment for mutual benefit which had existed initially. Upon termination of the bailment, Norfolk's duty to protect the ship changed dramatically. Then its only duty in admiralty was not to damage the HARRY ADAMS willfully or through gross negligence. Sellick v. Slipper Yacht Co., 386 F.2d 114 (9th Cir. 1967); Schneider v. Cowan, 165 F.Supp. 717 (E.D.N.Y.1958). The district court, therefore, applied an erroneous standard of care to Norfolk's conduct. When the correct legal standard is applied to the facts viewed most favorably to the defendant, we find no breach of the duty owed by Norfolk to the HARRY ADAMS.[2] Accordingly, we hold that Norfolk is entitled to recover its expenses in refloating and repairing the ship and reasonable storage charges from August 27, the date of the sinking, until the vessel was seized by the United States Marshal on September 18, 1974.
 
 IV.
 
 25
 Our decision regarding the legal duty owed by Norfolk to the HARRY ADAMS disposes of Mosele's counterclaim as well. Mosele has lost the use and value of his vessel, true, but only because he failed to satisfy a debt properly due and owing to Norfolk. Even after the ship sank and was refloated, Mosele could have recovered the vessel by prompt payment of his debt to Norfolk.
 
 
 26
 Upon remand, Mosele is entitled, of course, to have the proceeds from the sale of the HARRY ADAMS credited against the total amound due Norfolk. Whatever deficiency remains, if any, is the responsibility of Mosele personally.
 
 
 27
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 (The High Court of Admiralty and the Vice Admiralty Courts) were named after the admiral, an officer whose duties were at first solely administrative and military . . . . The Admiralty Court is considered as dating from 1360, when for the first time the admiral was expressly granted jurisdiction in civil maritime cases
 Encyclopedia Britannica, Vol. 11, at p. 501, "Maritime Law." See Renew v. United States, 1 F.Supp. 256, 259 (D.C.Ga.1932).
 
 
 [2]
 Testimony at trial established that yard watchmen employed by Norfolk checked the HARRY ADAMS at least twice every shift. Norfolk also at its own expense put pumps aboard and operated them. It is a fair inference the ship would have sunk soon after arrival but for the constant pumping. It must not be forgotten, as the district court found, "that this vessel, from the time it arrived at the Norfolk Shipbuilding & Drydock Company, was in constant danger of foundering, and . . . both the plaintiff and the defendant had full knowledge of this fact." Transcript at 324. Nor should it be forgotten that it was the owner, not Norfolk, who decided to postpone repairs to the hull and thus incurred the risk of sinking. To satisfy the standard of care imposed upon it by the district court, Norfolk would have had to provide, at its own expense, around-the-clock, on-board surveillance of the craft, and sufficient pumps, regardless of number and cost, to balance the intake of water so serious had the stern leakage become