**John W. MECOM, Plaintiff-Appellee Cross-Appellant,**

v.

**LEVINGSTON SHIPBUILDING COMPANY, Defendant-Appellant Cross-Appellee.**

No. 78–3154.

United States Court of Appeals, Fifth Circuit.

Aug. 4, 1980.

John Cash Smith, Anna L. Misak, Orange, Tex., for defendant-appellant cross-appellee.

Camp, Carmouche, Palmer, Carwile & Barish, Karl E. Boellert, Lake Charles, La., for plaintiff-appellee cross-appellant.

Before COLEMAN, Chief Judge, PECK,[*] and KRAVITCH, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This is an appeal from a judgment entered by a district court sitting in admiralty for damages arising out of the sinking of a barge in the Sabine River in Orange, Texas. The defendant contends that damages should be limited to the reasonable cost of removing the vessel from the river in the most efficient manner at the time the incident occurred. It further asserts that this action is barred by laches. Plaintiff cross-appeals, arguing that he is entitled to recover all expenses associated with his three unsuccessful attempts to remove the vessel from a navigable channel. Plaintiff also cross-appeals from the denial of prejudgment interest and the allowance of a set-off against his damage award for repairs to the barge that were performed by defendant prior to its sinking. We affirm in part and reverse in part.

In January, 1973, the plaintiff, John W. Mecom, raised his submersible drilling barge, Rig 25, after a long period of nonuse, and towed it to defendant's shipyard. Once

---

[*] Circuit Judge of the Sixth Circuit, sitting by designation.

there, it was placed in drydock and surveyed for damage to its hull and bottom. Upon learning that the state of deterioration made the prospect of repairing the barge uneconomical, Mecom instructed defendant, Levingston Shipbuilding Company (Levingston), to repair all holes found or cut in the hull. His intent was to tow the rig to another location for use as a dock barge or jetty.

Levingston made repairs to the hull, and, on February 15, 1973, removed the barge from drydock, located at the northern end of Orange Harbor Island, at Orange, Texas, and towed it to the southern end of the island. Levingston's dockmaster and his crew moored the barge to the bank of the island with manila ropes, intending to return with anchors and steel cables to further secure the vessel. Before they returned, however, the rig slipped off the mudflat where it had been placed and into a side branch of the Sabine River channel, a navigable waterway, where it sank with only a portion of the superstructure remaining above water.

Levingston was immediately notified of the sinking and thereafter conducted a thorough investigation into its cause. Mecom informed Levingston that he intended to hold it liable for the sinking. He also demanded that the defendant take such remedial measures as the law required, including the removal of the barge from the channel. Levingston responded, denying liability, but offering to raise the barge at Mecom's expense. Plaintiff refused this offer.

On June 23, 1973, the United States Army Corps of Engineers sent Mecom a notice that Rig 25 was obstructing navigation. The letter demanded that plaintiff remove or salvage the barge as required by the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 409,[1] and advised that the government would take action to remove it in the event Mecom failed to act. Shortly thereafter, Mecom contracted to remove the barge with a marine salvor, Ben Wyly, who had worked for plaintiff at various times over a several year period.

Wyly and his crew began operations to drag Rig 25 out of the navigable portion of the river in September or October of 1973. This effort continued through March of 1974, when, after dragging the rig 40 feet, the pulling tackle broke. Mr. Wyly testified that it was impossible to pull the barge any farther because of the steep slope of the river bottom. Wyly had requested a crane mounted on a barge to dig a 120 foot slip into which Rig 25 could be dragged. He testified that the only such crane in the area belonged to Mecom, but that it was temporarily unavailable because it was being used on another job at a distant location. Consequently, from March through the end of 1974, Wyly's efforts were confined to maintaining and rerigging the vessel, using a skeleton crew, while awaiting the arrival of the needed piece of equipment.

While waiting for the crane, Mecom heard of a polyurethane foam injection process, successfully used by the military to refloat sunken ships. After consulting with a manufacturer of the product, preparing

---

1. Section 15, 33 U.S.C. § 409, provides:

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timbers and logs, or to float what is known as "sack rafts of timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

the vessel, obtaining the proper equipment, and testing the foam at the site, Wyly attempted to refloat Rig 25 by injecting the foam into its hull. This effort lasted throughout 1975 and it too ended unsuccessfully. When this attempt failed, Wyly returned to the original dragging operation. He eventually obtained the crane needed to dig the slip, but his dragging activity was halted by the Coast Guard sometime in 1976 because of the pollution it was creating.

Mecom filed suit in October 1975, two years and eight months after the barge sank. In his final amended complaint, he demanded reimbursement for all of his removal expenses, amounting to $345,439 through 1976. Levingston denied liability in its answer and counterclaimed in the amount of $18,844 for the repairs made to plaintiff's rig prior to its sinking. The case was tried to the district court upon the issue of liability. Damages and laches were issues upon which a special master took evidence. The court concluded that Levingston was negligent in failing to adequately secure the rig. It adopted the special master's report in full, concluding that plaintiff should recover fully the $97,552 spent on the first ill-fated recovery attempt, up to the point at which the pulling tackle broke in March of 1974. Plaintiff's further expenses were denied as imprudent. In addition, the court granted Mecom $110,000, representing the present cost of removing the barge from the river. The laches issue was decided adversely to the defendant, the court finding that Levingston suffered no prejudice as a result of plaintiff's delay in filing his complaint. Levingston did prevail on its counterclaim for repairs, and Mecom was denied prejudgment interest on his damage award. From that judgment, both parties have perfected this appeal. Only the court's finding on the issue of liability is unchallenged here.

### The Present Cost of Removal

The district court awarded Mecom $110,000 as the present cost of removing Rig 25 from the Sabine River channel. The award was premised upon Mecom's continu-

ing duty to raise the vessel under § 15 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 409. At the time of hearing on damages before the special master, plaintiff had entered into a $110,000 contract for the removal of the barge, which the court found to be conclusive evidence on the cost of removal. Subsequent to the issuance of the master's report, but prior to the entry of judgment by the district court, however, Mecom abandoned Rig 25 to the government as permitted by § 15 of the Act. This circumstance, which was brought to the attention of the district court by the plaintiff, should have resulted in the court's deletion of this item of damages from the award.

In the recent case of *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 5 Cir. 1979, 598 F.2d 930, 934, this Court reviewed the principles governing the obligations and liability of a non-negligent owner of a sunken vessel. There, we said:

> The owner of a vessel sunk without any negligence on his part is still subject to the statutory obligation to remove the wreck, but is given an option: he may either raise the vessel himself and seek recovery of the expense from the party responsible for the sinking, or he may abandon the vessel and allow the United States to bear the burden of removal and recovery of expenses from the negligent party. If the non-negligent owner exercises his right to abandon, he is liable neither for the cost of removal nor for damages suffered by third parties as a result of the wreck. (Citations omitted.)

Had plaintiff not abandoned the rig prior to judgment, it is arguable that, in light of a vessel owner's continuing duty to remove, the $110,000 award would have been appropriate as reimbursement for a legal liability for expenses incurred but not yet paid. *See, e. g.*, 22 Am.Jur.2d *Damages* § 170. Since Mecom did abandon the barge, however, and because he is a non-negligent owner, he will never voluntarily incur the expense of raising the vessel, nor may he be forced to reimburse the government for its salvage costs. This item of the award,

therefore, represents compensation for a non-existent injury, and, as such, finds no justification in the law. Accordingly, we reverse this portion of the judgment.

## Actual Expenses

The issue of what part of the total expenses incurred in Mecom's unsuccessful attempts to salvage the barge should be charged to defendant is more difficult to resolve. The district court placed the burden of proof to show that the removal expenses were reasonable upon the plaintiff, and ruled that all expenditures made following the first unsuccessful dragging effort were imprudent. Defendant argues that the court was too charitable. Its position is that Mecom may recover, at most, the amount it would have cost to salvage the rig near the time it sank, using the least expensive removal method available. Levingston's expert in marine salvage testified by deposition that the barge could have been cut into sections and removed from the river for $60,000 in early 1973. Mecom contends that he is entitled to full reimbursement for his ill-fated salvage efforts, regardless of whether his conduct was prudent, because his actions were necessitated by his statutory duty to remove, which resulted as a direct consequence of defendant's wrongdoing.

In *Tennessee Valley Sand and Gravel Co. v. M/V Delta*, 5 Cir. 1979, 598 F.2d 930, 932, we stated that the rule in this Circuit is that the victim of tortious conduct is precluded from recovering for damages caused by his unreasonable conduct after the injury, where the defendant satisfies the burden assigned to him to show "(1) that the conduct was unreasonable, and (2) that it had the consequence of aggravating the harm." Explaining the rule's application, we went on to say:

Proof of only one of these contentions is insufficient as a matter of law to warrant denial of recovery. If the plaintiff acts unreasonably after defendant's tortious conduct, but this action has no impact on the scope of the harm, the defendant does not thereby escape liability for the full consequences of his own negligence. Similarly, if the plaintiff acts reasonably, the fact that his efforts turn out to be unsuccessful and actually increase the loss does not preclude recovery for all expenses incurred in the process. (Citations omitted.)

The plaintiff's barge, in *Tennessee Valley*, sank in navigable water under circumstances similar to the instant case. As here, both parties denied fault. The plaintiff decided to raise the barge without fully investigating its condition. Ten days into the salvage operation, the plaintiff was informed that the vessel had buckled upon sinking, and he was advised to inquire into the possibility of abandoning it. He instructed the salvor to go ahead with the operation without consulting with the Corps of Engineers. The barge was raised and sold for scrap. The plaintiff then sued the defendant for the salvage expenses. The district court found the defendant to be at fault, but denied the plaintiff any recovery on the ground that he failed to "mitigate" damages. We reversed, holding that the plaintiff's conduct in removing the barge was reasonable, even without a full investigation into its condition or the possibility of abandonment, in view of his potential exposure to liability under the Rivers and Harbors Act.

We believe *Tennessee Valley* requires us to modify the district court's award of damages for expenses incurred in this case. We agree with the court that it was reasonable for plaintiff to initially attempt to remove his barge from the Sabine River channel using the dragging method. As was the case in *Tennessee Valley*, both parties denied fault for the sinking, and Mecom could reasonably have believed he might be ultimately liable for the expense of a government salvage operation, which the *Tennessee Valley* court observed can be more costly than a private undertaking, 598 F.2d at 935, in the event he chose to abandon the barge. One witness questioned the feasibility of salvaging the barge using the dragging method, but all others qualified to offer an opinion testified that pulling the

rig into a slip was a reasonable approach to the problem. Indeed, even a drilling equipment surveyor hired by the defendant to advise it on available means of salvaging the barge and the costs associated therewith testified that he would have initially tried to pull the barge out. We conclude, however, that the court's denial of all further expenses on the ground that Mecom failed to follow the most prudent course of conduct subsequent to March of 1974 is based on an erroneous legal standard and an improper assignment of the burden of proof.

▮ The applicable standard for judging a plaintiff's conduct is whether his decision falls within the "range of reason," not whether he has chosen the most prudent course of action. *Ellerman Lines, Ltd. v. The President Harding*, 2 Cir. 1961, 288 F.2d 288, 290. Where the necessity for decision making has been thrust upon the victim by the wrongdoer, "[w]e do not require 'infallibility or exactness of mathematical formula,' and we will allow the injured party a wide latitude in determining how best to deal with the situation." *Tennessee Valley, supra* at 933 (citation omitted). Moreover, in determining whether the plaintiff's action subsequent to his initial unsuccessful attempt to raise the barge became unreasonable, "[t]he momentum of the initial decision, clearly reasonable at the time, must . . . be taken into account . . . . [T]he defendant must show that adherence to the initial decision had become not merely erroneous but palpably so." *Ellerman Lines, Ltd., supra* at 291.

▮ After carefully reviewing the entire record in addition to the district court's findings of fact and conclusions of law, and applying the above stated standard, we modify the judgment with regard to the $50,500 in expenses incurred between March, 1974, and December of that year. Plaintiff's expenditures during this period were made in contemplation of completing his original plan to dig a trench into which the rig could be pulled. It is true that activity in pursuance of this plan was cur-

tailed in March of 1974 and temporarily abandoned in 1975 because of the unavailability of plaintiff's crane. We believe, however, that the evidence shows that the initial decision to pull the barge into a slip was made in good faith and the extended unavailability of the crane was not foreseen. By March of '74, the salvage operation had progressed to such a stage that it compelled the decision to await the arrival of the crane to finish the enterprise. Under these circumstances, we can find no evidence that would support a conclusion that defendant had shown plaintiff's conduct to be unreasonable.

We affirm that portion of the district court's judgment denying plaintiff recovery of expenses associated with the urethane foam operation, and his expenses incurred thereafter. Defendant has persuasively demonstrated that plaintiff's decision to attempt to refloat the drilling rig by injecting foam into the hull was not within the range of reason, given the facts that existed at the time the decision was made. We also hold that Levingston proved that its damages were aggravated by plaintiff's unreasonable conduct.

Two factors to be considered when determining whether the decision to follow a particular course of conduct was reasonable are the viewpoint of the victim at the time he acted and the length of time that he had for decision. *See generally Tennessee Valley, supra* at 933. Both factors in the present case militate against a finding that plaintiff's conduct was reasonable. Nearly two years had passed since the sinking of the barge when plaintiff decided to abandon his initial plan to drag the rig into a slip and pursue an alternative course of action. Mecom's duty to remove the vessel had not abated, and fault for the sinking had not yet been determined. Plaintiff still faced the alternative of abandoning the barge and potentially having to pay the government for removal expenses, or undertaking to remove it through private efforts. Mecom decided to remove the wreck himself using a foam injection method. Plaintiff argues that his decision was moti-

vated by the desire to avoid the higher cost that might be associated with a governmental salvage operation. If we accept plaintiff's cost-cutting rationale as the basis for his decision, it is incongruous that he would, as he did, fail to investigate the alternative private methods of removal that were available and compare their relative costs. The evidence showed that there existed at least one less expensive option. The necessity for an immediate decision had passed, and enough time had elapsed since the initial crisis to bring the full light of reason to bear upon the problem of removal.

In addition to the foam operation being unreasonable in light of plaintiff's proffered rationale for his action and the length of time he had for decision, every qualified witness agreed that refloating the barge using the foam injection method was infeasible in 1975, given the deteriorated condition of the drilling rig, and the fact that it had by then filled with a great quantity of mud. Even Ben Wyly, plaintiff's salvor, conceded that the decision to refloat was unwise because preliminary tests indicated that the foam would not reach the necessary density to float the vessel at the depth at which it rested.

Defendant also satisfied its burden to show that the decision to refloat the barge augmented its damages. Lee Statler, a marine salvor, surveyed the rig at Levingston's request and estimated that it would cost $86,000 to salvage the barge in 1976 by cutting it up and removing it in sections with a crane, a method employed by several salvage companies in the Gulf Coast area. By comparison, the unsuccessful foam injection attempt cost Mecom $168,000. Assuming, for the sake of argument, that Statler's bid was conservative, and recognizing that, if Mecom had abandoned the barge in 1975 and the government had contracted on a non-competitive basis to remove the vessel using the method suggested by Statler, the cost might well have been far greater than Statler's estimate, we nevertheless believe that the evidence warrants the conclusion that the cost of breaking up the barge and removing it in pieces would not have approached the $168,000 expended by Mecom in his refloating effort.

We further conclude that plaintiff's resumption of his dragging effort after abandoning his refloatation attempt was unreasonable. While this action may have been logical and fully justified had it occurred within a reasonable time after March of 1974, we agree with the district court that by 1976, dragging reasonably appeared to be a lost effort. Thus, we affirm the court's denial of recovery for the 1976 expenditure of $35,950 spent in converting from the ill-fated urethane method and in furtherance of the resumed dragging effort.

### Laches

Defendant also appeals from the district court's adverse determination on the issue of laches. Employing the "analogy rule" applicable in admiralty cases, the trial court held that this action sounded in tort rather than contract, and held that the analogous statute of limitations was the Texas two-year statute. Article 5526, Vernon's Ann. Tex.Stat. This action was commenced two years and eight months after the sinking of Rig 25. Accordingly, the court found that the statute had run at the time suit was filed. The court further found, however, that the defendant suffered no prejudice as a consequence of plaintiff's delay in filing suit.

Laches is an equitable doctrine that, if proved, is a complete defense to an action irrespective of whether the analogous state statute of limitation has run. As interpreted by this court, the analogy rule serves primarily to determine where rests the burden of proof. "[W]hen a plaintiff files a claim in admiralty within the analogous statutory period, defendant must show inexcusable delay and resulting prejudice in order to establish a laches defense." *Barrois v. Nelda Faye, Inc.*, 5 Cir. 1979, 597 F.2d 881, 885. Where, as here, the statute has run prior to instituting suit, the plaintiff must prove either absence of prejudice or excuse for delay to repel a claim of laches. *Watz v. Zapata Off-Shore Co.*, 5 Cir. 1970, 431 F.2d 100.

■ Defendant argues that it was affirmatively misled by plaintiff as to the nature of the claim against which it would have to defend, and, therefore, was not prepared to meet the claim actually pressed. Levingston concedes that its liability defense was not prejudiced by plaintiff's delay, but it contends that it was handicapped in defending against plaintiff's claim for removal expenses because Mecom placed particular emphasis on being compensated for the value of the barge. As a result of the highly inflated figure plaintiff demanded for the vessel, Levingston asserts that it confined its investigation, conducted shortly after the sinking, to ascertaining the cause of the accident and the value of the rig.

The evidence clearly refutes defendant's argument. Levingston was informed of the sinking on the day it occurred. Mecom, through his attorneys, demanded that defendant remove the barge from the channel as required by law, and gave notice that he intended to hold Levingston liable for any "consequential" damages in addition to the value of the barge. Furthermore, Mr. McDonald, defendant's chairman of the board, testified that Levingston knew from the beginning that plaintiff intended to make a claim for the cost of removing the barge from the river. *See generally Molnar v. Gulfcoast Transit Company*, 5 Cir. 1967, 371 F.2d 639; and *Akers v. State Marine Lines, Inc.*, 5 Cir. 1965, 344 F.2d 217. Yet, while defendant directed its attorneys to conduct a "complete investigation," no survey to determine the cost of removing the vessel from the river was made. Mr. McDonald's testimony suggests that this was a tactical decision made by defendant upon the advice of its lawyers and not induced by plaintiff's conduct.

Defendant further argues that it was entitled to participate in the selection of a salvor and the method to be used in removing the barge. Failure to permit it to do so, it contends, resulted in an inability to monitor expenditures to determine their reasonableness, to defendant's prejudice. Closely related is defendant's assertion that the accounting method employed by plaintiff resulted in expense records of such poor quality that defendant was severely handicapped in showing that particular expenses were not "reasonable, necessary or prudent."

We answer defendant's first argument by noting that it produced no evidence of any rebuffed attempt to participate in the selection of a salvor or to recommend a method of removal. Thus, even were we to recognize the novel right here contended for by defendant, it has failed to show any detriment.

The question of the quality of plaintiff's expense records is one of credibility, not laches. Plaintiff introduced the records of his expenses and bore the burden of proving his expenses through them and through the testimony of Ben Wyly. Defendant introduced the testimony of two experts to the effect that plaintiff's accounting methods did not accord with recognized accounting principles. The trial court chose to credit plaintiff's evidence. Neither this finding nor the finding that defendant suffered no prejudice is clearly erroneous.

### Set-Off

■ Plaintiff cross-appeals from the judgment of the district court allowing the defendant an $18,844 set-off for the repairs to Rig 25 completed just prior to its sinking. Plaintiff argues that failing to keep the barge afloat after drydocking and repairs constituted a breach of warranty of workmanlike service implied in marine contracts. *See, e. g., H & H Ship Service Co. v. Weyerhaeuser Line*, 9 Cir. 1967, 382 F.2d 711, 712.

When Mecom towed the barge to Levingston's shipyard, it was kept afloat by using pumps to keep it from flooding. Both the plaintiff and the defendant knew that the vessel would not float without constant pumping. They also knew that the patch job ordered by plaintiff would not make the rig seaworthy. The parties' knowledge of these facts, and the explicit agreement for repairs concluded between them precludes a finding that defendant impliedly warranted that its repairs would prevent the barge from sinking. Defendant's duty to insure

that the barge remained afloat stemmed from its relationship as bailee to plaintiff. *Midland Enterprises, Inc. v. Notre Dame F. & T. Serv. Inc.*, 8 Cir. 1976, 538 F.2d 1356. Its negligence occurred after the repairs were made. We agree with the Fourth Circuit, which, when presented with a similar problem, held that a shipyard's negligence occurring after repairs are made gives rise to a set-off for damages against the amount due on account, but does not vitiate the contractual obligation of the vessel owner to pay for the work done. *Norfolk Shipbuilding and Drydock Corp. v. M/V Harry W. Adams*, 4 Cir. 1976, 537 F.2d 1222.

### Prejudgment Interest

 The final issue presented for this court's consideration is plaintiff's contention that the district court abused its discretion in disallowing prejudgment interest from the date of the sinking. "[I]n admiralty cases the award of prejudgment interest is the rule rather than the exception. Discretion to deny interest must be based on the existence of peculiar circumstances. . . ." *American Zinc Co. v. Foster*, 5 Cir. 441 F.2d 1100, 1101, *cert. denied*, 1971, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95. Several factors may serve as an adequate basis for awarding interest only from the date of judgment. Among them are plaintiff's delay in bringing suit, *Sinclair Refining Co. v. SS Green Island*, 5 Cir. 1970, 426 F.2d 260, the existence of a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved, *United States v. Cook*, 5 Cir. 1972, 463 F.2d 123, and judgment in an amount substantially less than that claimed. *Kawasaki Zosensho v. Cosulich Societa Triestina Di Navigazione*, 5 Cir. 1926, 11 F.2d 836.

The trial court found more than one of these factors to be present in the instant case. Accordingly, we hold that the denial of prejudgment interest was not an abuse of discretion.

In summary, we hold that plaintiff is entitled to recover $142,117 spent in 1973 and 1974, minus the $18,844 set-off for re-

pairs. The judgment of the district court is affirmed in all other respects. The case is remanded to the district court with directions to enter judgment for the plaintiff in the amount of $123,273.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.