[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11112
_____

D.C. Docket No. 3:71-cv-00044-TJC-PDB

OLIVETTE COFFEY, JR.,
HARRY J. JOHNSON,
NANCY J. BRACKETT,
JACKSONVILLE BROTHERHOOD OF FIREFIGHTERS,

Plaintiffs-Appellants,

versus

DWIGHT BRADDY,
in his capacity as a member of the civil service board of the city of Jacksonville,
Florida,
J.C. DEKLE,
in his capacity as a member of the civil service board of the city of Jacksonville,
Florida,
WILLIAM HALLOWES,
in his capacity as a member of the civil service board of the city of Jacksonville,
Florida,
WARREN E. THOMAS,
in his capacity as a member of the civil service board of the city of Jacksonville,
Florida,
BOYD JOLLY,
in his capacity as a member of the civil service board of the city of Jacksonville,
Florida, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 23, 2016)

Before TJOFLAT, MARCUS, and ROGERS,[*] Circuit Judges.

ROGERS, Circuit Judge:

Thirty-four years ago, in 1982, the district court entered a consent decree requiring the City of Jacksonville to hire in its fire department "an equal number of blacks and whites until the ratio of black fire fighters to white fire fighters reflects the ratio of black citizens to white citizens in the City of Jacksonville."  The City complied for ten years, until it unilaterally and without the district court's approval stopped following the decree in 1992.  In the years following, employees moved away or died, documents were lost or destroyed, and public debate over the once-again falling numbers of African-American firefighters sparked the City in 1999 to institute new hiring protocols—but the plaintiffs did not try to enforce the decree.  It was not until 2007, some fifteen years after the City had stopped complying with the decree, that the plaintiffs brought a motion to show cause as to why the City should not be held in contempt of the 1982 consent decree.  The district court

_____

[*] Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

denied the plaintiffs' motion on grounds of laches, and dissolved the decree. Because the plaintiffs' fifteen-year delay prejudiced the City's ability to defend itself and because a new lawsuit had taken up the cause of fighting racial discrimination in the City's firefighting department, neither the district court's application of laches nor its dissolution of the 1982 consent decree was an abuse of discretion.

This lawsuit dates back to 1971, when a class action lawsuit filed on behalf of all past, present, and future black employees and employment applicants of the Fire Department of the City of Jacksonville claimed that the department's hiring practices violated the class members' civil rights. In August of that year, United States District Judge Charles Scott, now deceased, issued a consent decree requiring the City to follow certain hiring practices, including that the City "take whatever action is necessary to hire fifty (50%) percent black and fifty (50%) percent white individuals to fill funded positions of Fire Private from the appropriate eligible list until the ratio in the Fire Department of black firemen to white firemen equals the ratio of black citizens to white citizens in the City of Jacksonville." Appointments from such eligibility lists were to be governed by the "rule of three" as provided by the civil service rules at the time.[1] In 1982, with the

---

[1] The eligibility list ranked the candidates according to their final scores on entrance exams and other factors. *See Nash v. Consol. City of Jacksonville*, 895 F. Supp. 1536, 1539 (M.D. Fla. 1995). Under "the rule of three," the person hired must be ranked within the top three candidates

consent of the parties, Judge Scott modified the decree by removing the eligibility-list procedure and imposing an "absolute requirement" that the fire department "hire an equal number of blacks and whites until the ratio of black fire fighters to white fire fighters reflects the ratio of black citizens to white citizens in the City of Jacksonville." The City abided by the one-to-one hiring requirement until 1992, when it stopped complying (by its own admission) with the decree without first petitioning the district court for release.

After the parties finished litigating attorneys' fees and costs in 1984, there was no further activity in the case until the plaintiffs filed the instant motion to show cause in 2007. In their motion, the plaintiffs claim that the City has been in contempt of the decree's one-to-one hiring requirement from the time that the City admittedly ended compliance with the decree in 1992. The City responded by claiming that the decree's terms permitted the City to stop hiring one-to-one once the ratio of African-Americans to whites in the fire department matched the ratio of African-Americans to whites in the City's population (which it claimed occurred in 1992) and by arguing that, in any event, the equitable defense of laches bars the plaintiffs' motion. The City also moved to dissolve the decree.

---

on the eligibility list. *Id.* Thus, the rule of three allowed for some discretion in hiring, as long as the person hired was ranked in the top three. *Id.*

From 2007 to 2013, the parties engaged in global settlement discussions of this and other related suits, but to no avail.[2]  In 2013, once settlement negotiations had proven unfruitful, the district court conducted a two-day evidentiary hearing. As the district court noted, although it is undisputed that the City stopped hiring one-to-one in 1992, the evidence gathered at the hearing was incomplete as to how or why the City decided to stop complying with the decree.

The evidentiary hearing revealed that in September 1991, W. Newby Kelts from the City's Department of Personnel sent a memorandum to the City's general counsel stating that the most recently hired firefighters had brought the City into compliance with the decree and asking what, if anything, must be done.  In response, an October 1991 memorandum from Steven Rohan, a deputy general counsel of the City, advised that because the ratio of black-to-white firefighters had reached the ratio of black-to-white citizens in the general population, "no further taxpayers' dollars need be expended" to seek court approval of the City's decision to stop hiring one-to-one.  The memo reasoned that the decree was "self-executing," meaning that the one-to-one hiring requirement ceased to operate by its own terms once the fire-department ratio reached the general-population ratio. However, it is not clear when or if the fire department relied on the Kelts-Rohan memorandum exchange, because a year later Eugene Callahan, a personnel official

---

[2] Any delay from 2007 to the present therefore cannot be attributed to the plaintiffs.

in the fire department, wrote a letter to the general counsel's office again asking whether the intent of the decree had yet been satisfied.

It is thus unclear who made the final decision to end compliance with the decree without seeking court approval and when exactly that decision was made. Rohan, who insisted that he was not the ultimate decision-maker, suggested that the decision was likely made by someone at the highest level, such as the general counsel or mayor. Callahan recalled attending a meeting with the mayor during which an advisor to the mayor stated that the City need not return to court to obtain permission to stop following the decree. Callahan also testified that he did not recall any official announcement or press release detailing the City's decision to stop hiring one-to-one. However, despite the ambiguities over who made the decision to abandon the decree, it is clear that the City adopted new hiring policies in 1992 that departed from the requirements of the consent decree.

Additionally, it cannot be determined from the available evidence whether "the ratio of black fire fighters to white fire fighters" did indeed "reflect[] the ratio of black citizens to white citizens in the City of Jacksonville" in 1992, as the City claims. As an initial issue, it is unclear what percentage of African-American firefighters would have satisfied the decree's requirement. The parties' agreement stated that the black-to-white ratio should equal the population of "the Consolidated City of Jacksonville," while the court's decree stated that the ratio

6

should reflect the population of the "City of Jacksonville." The City and Duval County merged in 1968 to create the "Consolidated City of Jacksonville," and, confusingly, "[t]he name of the consolidated government is City of Jacksonville." Laws of Fl. Ch. 92-341, § 1.101(a) (1992) (readopting Ch. 67-1320). It is thus unclear whether the court, in deviating from the parties' agreement by using the specific term "City of Jacksonville," meant to refer to only the city or to the entire consolidated city. The distinction is important, as the "consolidated city" and the "city" comprise different geographic areas with different ratios of African-American and white residents. Census data from 1990 shows that 25.99% of the city was African-American and 74.02% was white, whereas 25.08% of all of Duval County (the consolidated city) was African-American and 74.92% was white. Rohan's October 1991 memo relied on a figure that 25.1% of the fire department's employees were African-American, and Callahan's 1992 letter relied on a figure that 25.3% of the fire department personnel were African-American. Both figures would have passed muster if the consolidated city were the benchmark, but both would have fallen short if the city were the operative geographic area.

Furthermore, it is not possible to verify whether the figures used by Rohan and Callahan accurately reflected the racial makeup of the fire department, as the fire department's employment records are incomplete and available witnesses could not recall exact employment figures. A witness testified that relevant

7

employment documents were likely innocently destroyed in accordance with Florida's document retention schedule. Additionally, Callahan testified that he was not sure whether the 25.3% figure he relied on in 1992 reflected the percentage of only African-American firefighters or the percentage of all African-American personnel (including non-firefighter staff) in the department. Without the fire department's original employment records, it is impossible to determine with certainty the ratio of black-to-white firefighters in 1992.

What is certain is that the drop in the hiring of black firefighters following the City's abandonment of the one-to-one hiring was dramatic. For instance, out of the 136 firefighters that the City hired from 1992 to 1997, only one was African-American. When existing black firefighters noticed the disparity and asked about the consent decree, they were told that the City had stopped hiring one-to-one because the terms of the decree had been met. None of them inquired any further.

The Jacksonville Brotherhood of Firefighters, an organization of minority firefighters, did take some action in light of the City's abandonment of the one-to-one hiring.[3] In 1993, the President of the Brotherhood sent a letter to the City, asking why the City was no longer hiring one-to-one and requesting a copy of the court petition seeking release from the decree. The City responded that "the City

---

[3] While the Brotherhood is not a plaintiff in this suit, all of the African-American firefighters who testified at the evidentiary hearing belong to the Brotherhood.

did not need to get a court order," because the decree was extinguished when its goals were achieved. The City explained that no court action was required on its part to end compliance "in the same way that in a divorce case, a parent paying child support need not seek court relief when the child turns 18 and support is no longer due." Among other documents, the City attached Rohan's October 1991 memorandum to its response letter. There is no evidence as to what, if anything, the Brotherhood did with this information.

Four years later, in 1997, the Florida Times-Union reported on the drop in the number of black firefighters being hired—which it attributed to the end of one-to-one hiring in 1992—and warned of a new City Council proposal that was feared to make the racial disparity even worse. Due to the media attention, the plaintiffs' former lawyer William Sheppard wrote the mayor to suggest that the mayor familiarize himself with the *Coffey* litigation. However, Sheppard, a well-known and highly regarded civil-rights attorney, made no mention of the possibility that court action could still be used to enforce the 1982 consent decree. After much public debate, the City, with the support of black firefighters, passed a new ordinance in 1999 that sought to remove obstacles to minority hiring.

Despite the changes made in 1999, the number of African-Americans hired by the fire department continued to be low. In 2007, the Brotherhood retained new

9

counsel.  The counsel brought in new class representatives and filed the instant motion to show cause.

The district court denied the plaintiffs' motion on the ground of laches and also granted the City's motion to dissolve the consent decree.  The district court explained that if the plaintiffs had sued in 1992 or the years immediately following, "the City would have had a lot of explaining to do."  But, due to incomplete memories, the fact that several key City personnel had passed away or moved away, the spottiness of the paper trail, ambiguities in the documents that were in the record, and the fact that the City has been operating under a different hiring procedure since 1999, the district court concluded that the "plaintiffs['] waiting until fifteen years later is simply too prejudicial to the City."  The district court held that the plaintiffs' claim is barred by laches because "this record is not one upon which the Court today could make the required findings to determine whether to hold the City in contempt."

The district court also granted the City's motion to dissolve the consent decree.  The district court refused to reinstate the decree as written because its racial quotas are not constitutional under the modern standard for affirmative action and because adapting the 1982 decree to the new hiring practices that began in 1999 could be problematic.  Additionally, the district court refused to modify the decree because "there is a modern successor which has taken up the mantle of the

Coffey suit." Having eliminated the alternatives to dissolution, the district court then reasoned that the decree "cannot be enforced because of laches" and dissolved the decree. The plaintiffs timely appealed, arguing that the district court's application of laches was an abuse of discretion.

The district court did not abuse its discretion in holding that laches barred the plaintiffs' motion, because the plaintiffs' fifteen-year delay in bringing their motion to show cause was not excusable and unduly prejudiced the City's ability to defend itself. To assert a successful defense of laches, a defendant must show "a delay in asserting a right or claim, that the delay was not excusable[,] and that there was undue prejudice to the party against whom the claim is asserted." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1283 (11th Cir. 2015) (quoting *Ecology Ctr. of La., Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975)). Because the fifteen-year gap between when the City ended compliance with the decree and when the plaintiffs filed their motion undeniably constitutes a "delay," the arguments on appeal focus on whether the plaintiffs' delay was excusable and whether the delay prejudiced the City.

First, the district court did not abuse its discretion in finding that the plaintiffs' fifteen-year delay was not excusable. The plaintiffs unquestionably knew about the City's position regarding the consent decree by at least 1999 (and likely well before that) and yet did nothing to attempt to enforce the decree. At

11

oral argument, the plaintiffs argued that their delay should be excused because the City gave them "the runaround" when they asked about the decree in the early and mid-1990s.  In a similar fashion, they argue that the City has "unclean hands" that prevent the City from asserting the equitable defense of laches because, they claim, the City "abandon[ed] the consent decree and l[ied] about it afterward to any formal or informal inquiry," and concealed the "'dissolution' and 'meeting' the requirements of the decree" in a way that prevented the plaintiffs from bringing their motion earlier.  It is true that a defendant may not be able to base a defense on laches if the defendant contributed substantially to the delay in the filing of the suit or if the delay results from the defendant's concealing or misrepresenting facts.  *S. Grouts & Mortars, Inc. v. 3M Co.*, No. 07-61388-CIV, 2008 WL 4346798, at *7 (S.D. Fla. Sept. 17, 2008) (citing *Potash Co. of Am. v. Int'l Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954));  *E.T. Mfg. Co. v. Xomed, Inc.*, 679 F. Supp. 1082, 1085 (M.D. Fla. 1987) (citing *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir. 1986); *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346, 349 (6th Cir. 1979)).  Here, however, neither a "runaround" nor "unclean hands" excused the plaintiffs' delay; the City did not conceal its decision to end compliance with the consent decree or otherwise contribute to the plaintiffs' delay.

Contrary to the plaintiffs' assertions, the evidence does not show that the City concealed its decision to abandon the consent decree or lied about it

12

afterward.  In fact, it shows just the opposite—the City was quite transparent about its rationale for ending the one-to-one hiring.  When the Brotherhood asked the City in 1993 why it was no longer hiring one-to-one and requested copies of the court petition seeking release from the decree, the City responded in no uncertain terms that it believed that the goals of the consent decree had been achieved and that "the City did not need to get a court order" to end compliance with the decree.  Likewise, black firefighters testified that the City told them that the one-to-one hiring had been stopped because the decree had been met.  The City did not lie or conceal any information—it was true that the City had stopped complying with the decree because it believed that it had fulfilled its duties under the decree.  These individuals could have inquired further about the propriety of the City's ending its compliance with the consent decree—especially given the fact that they noticed that African-Americans were unrepresented in new hires—but did not.  Armed with the information that the City had stopped complying with the decree without first seeking the court's permission, the plaintiffs could have immediately gone to court.  If the plaintiffs perceived the City's responses as giving them "the runaround," this provided all the more reason for them to take their grievances to the district court immediately.

As the district court noted, it may be unfair to impute knowledge of the City's noncompliance with the decree to the plaintiffs who are African-Americans

13

who wanted to be firefighters.  However, in light of the publicity surrounding the adoption of new hiring protocols in 1999, the district court found that "in addition to the original plaintiffs who were subsequently hired and had notice of the change as early as 1993, African-Americans in the community and those who wanted to be hired as firefighters knew at least by 1999 (and probably well before) that the City was no longer following the one to one hiring protocol."  The plaintiffs have not cited anything in the record that contradicts the district court's finding that the media attention from 1997 to 1999 fairly gave notice to African-Americans in the community that the City was no longer hiring one-to-one, and the district court's factual finding on this matter therefore is not clearly erroneous.  Thus, because it was common knowledge that the City was not abiding by the consent decree for at least eight years prior to the plaintiffs' filing of their motion, there is no excuse for the plaintiffs' delaying so long in bringing their motion.

Second, the district court did not abuse its discretion in finding that the plaintiffs' inexcusable delay unduly prejudiced the City's ability to defend itself, because unclear memories and incomplete documents made it impossible to determine whether the City was, in fact, in contempt when it ended compliance in 1992.  The district court laid out three problematic ambiguities in the documentary evidence that prevented the court from determining whether the City was in contempt of the decree: (1) the parties' stipulation required the ratios of the fire

14

department and the general population to be "equal" whereas the district court's order stated that the department's ratio must merely "reflect" the ratio in the general population, which may or may not have been intended to be a less demanding standard than "equal"; (2) the parties' stipulation referred to the hiring of fire department "employees," while the district court's order referred to the hiring of "firefighters," making it unclear whether the City was permitted to include non-firefighter staff in the calculations; and (3) the above-mentioned discrepancy over whether the "city" or the "consolidated city" was the operative benchmark. Compounding these ambiguities is the fact that employment records and testimony could not determine with any certainty how many black firefighters or other staff were employed by the City in 1992.

Due to these undeniable ambiguities in the record, the district court was well within its discretion in holding that the City was unduly prejudiced by the delay because the passage of time has made it impossible to make the required findings to determine whether or not the City was in contempt of the decree. The plaintiffs respond that the City was not prejudiced by the 15-year delay, because, they contend, "the key personnel who were involved at the time in 1992 that the decree was abandoned are still there today and testified." However, the plaintiffs do not point to testimony or documents in the record that clearly resolve the ambiguities noted by the district court. For example, the plaintiffs contend that the district

15

court created an ambiguity out of nothing by distinguishing between the "city" and the "consolidated city."  But the plaintiffs do not point to anything in the record that establishes that the meaning of the decree was clear; instead, they merely make the argument that the specific use of "City of Jacksonville" meant that the city, and not the consolidated city, was the operative benchmark.  While the plaintiffs present a cogent argument, it is also very possible that due to the legal reality of the city's recent consolidation, the district court assumed that any reference to the "City of Jacksonville" would naturally mean the entire "consolidated city."  There is simply no record evidence that clears up this ambiguity.  Rather than helping their case, the plaintiffs' argument regarding the "city vs. consolidated city" illustrates the difficulty of trying to determine today the intents of the court and of the drafters of the parties' agreement.  Therefore, because the plaintiffs fail to identify testimony or documents that fill in the gaps identified by the district court, their argument that the City is not prejudiced by their delay lacks merit.

In a similar vein, the plaintiffs argue that the City is at fault for failing to maintain records that would show that the terms of the decree had been met. However, as a witness testified, the documents were likely innocently destroyed in accordance with Florida's document retention schedule.  The plaintiffs have produced no evidence that the City destroyed the records in bad faith or in an

attempt to avoid liability in a suit about the consent decree. Ultimately, the fact that records were lost or destroyed in the interim fifteen years is more a product of the plaintiffs' delay than of the City's malfeasance.

The plaintiffs also argue that the district court abused its discretion because, they claim, the district court had already determined both that the City's ending compliance without petitioning the court was unlawful and that the City was in contempt of the decree before it then held that the plaintiffs' claim was barred by laches. The district court did no such thing. While the district court expressed strong doubt as to the correctness of the City's description of the consent decree as "self-executing," the district court ultimately found that "the scant record as to how [the decision to end compliance] was made or the basis for it renders a further determination of the issue impossible." Moreover, even if the district court did hold that the City was wrong to end compliance without first petitioning the court, the district court did not find that the City was in contempt of the decree. Rather, as explained above, the district court emphasized that ambiguities in the record make it impossible to determine today whether or not a timely motion by the City to dissolve the decree would have been successful.

Another argument the plaintiffs make is that the district court wrongly placed the burden of proof for laches on them, rather than on the defendants. When a claim is filed within the analogous statutory period, the burden is on the

defendant to show that it was prejudiced by the plaintiff's inexcusable delay; when the claim is filed outside of the statutory period, the plaintiff must show either absence of prejudice or an excuse for delay. *Mecom v. Levingston Shipbuilding*, 622 F.2d 1209, 1215 (5th Cir. 1980). Here, even if we assume that the plaintiffs are correct that the statute of limitations to enforce a court's consent decree is twenty years—thus placing the burden of showing laches on the defendants—the plaintiffs' argument fails. The plaintiffs have not cited or quoted any specific section of the district court's order where the district court wrongly assigned them the burden of proof, as no such section exists. Indeed, the record reflects that the district court placed the burden squarely on the defendants. The district court began its explanation of laches by stating: "A defendant is required to show three elements to prove the equitable defense of laches . . . ." This phrase clearly indicates that the district court placed the burden of proof on the defendants and that the plaintiffs' argument to the contrary is without merit.

In making their burden-of-proof argument, the plaintiffs posit: "Can a class of plaintiffs who sought to be hired but were turned away be blamed for not knowing the City had broken its legally binding promises?" The plaintiffs seem to be arguing that the district court assigned them the burden of proof by wrongly finding that the plaintiffs were aware of the City's changed hiring practices, even though they claim that they had no personal knowledge of the change. However,

18

as explained above, it was not clearly erroneous for the district court to find that the media coverage surrounding the 1999 change in hiring practices fairly provided notice to all African-American members of the community who wanted to be hired as firefighters of the City's abandonment of the one-to-one hiring. The plaintiffs do not respond to this point and do not explain why they filed their motion an additional eight years after it became public that the City had ended the one-to-one hiring.

Finally, the district court's dissolving the consent decree (as opposed to leaving the decree in place or modifying the decree) was not an abuse of discretion. A district court may modify or terminate a consent decree, subject to abuse-of-discretion review, if changed circumstances have "caused compliance with the decree to become substantially more onerous," have "rendered the decree impracticable," or have caused its continued enforcement to be "inimical to the public interest." *Johnson v. Florida*, 348 F.3d 1334, 1344 (11th Cir. 2003). "In sum, termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent discrimination in the future or to remedy the effects of past discrimination." *United States v. City of Miami*, 2 F.3d 1497, 1508 (11th Cir. 1993).

The district court did not abuse its discretion, because changes in the law made continued enforcement of the consent decree unlawful and because the

19

existence of a new suit challenging the City's current hiring practices made modification of the decree inimical to the public interest. First, the district court correctly reasoned that the consent decree as written could not be reinstated, because, as the Supreme Court has explained, "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 388 (1992). The decree, which requires that the black-to-white ratio of the fire-department workforce reflect the black-to-white ratio of the City's population, violates the Equal Protection Clause's requirement that the minority composition of the workforce in question be compared to the qualified minority population in the relevant labor market rather than the general population, *see City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501–02 (1989). Further, the quota-based hiring required by the decree would not likely pass strict scrutiny. *See id.* at 507. The plaintiffs offer no response to this point regarding the changes in constitutional law.

Second, the district court did not abuse its discretion in refusing to modify the consent decree, because it would be contrary to the public interest to use this lawsuit to ensure that the City's firefighting department is not racially discriminatory when a new lawsuit was in a better position to do so. As the district court noted, a new lawsuit (which was recently settled) challenging the fire

20

department's modern hiring practices was filed in 2013 by the Brotherhood and the Jacksonville Chapter of the NAACP on behalf of themselves and a class consisting of present, past, and future black employees and candidates for employment. Termination of the 1982 decree was appropriate because the 1982 decree was no longer necessary to prevent future discrimination in the City's firefighting department or to remedy the effects of past discrimination—the new lawsuit would see to that. The plaintiffs responded at oral argument that the statute of limitations prevented the new lawsuit from reaching all of the class members in this case. However, the fact that the statute of limitations precludes relief for some class members is due to the plaintiffs' own delay, and does not change the fact that the new lawsuit was a much better vehicle for determining the current extent of discrimination in the City's firefighting department and assessing what measures, if any, needed to be put in place to remedy past discrimination and prevent future discrimination.

For the foregoing reasons, we affirm the district court's order denying the plaintiffs' motion to show cause and dissolving the consent decree.