**INLAND OIL AND TRANSPORT CO.,
Plaintiff-Appellee Cross-Appellant,**

v.

**ARK–WHITE TOWING CO., et al., Defendants,**

**Murphy Marine Service, Inc., Defendant-Appellant Cross-Appellee.**

No. 81–3532.

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1983.

Johnson & McAlpine, Ronald A. Johnson, New Orleans, La., for defendant-appellant cross-appellee.

Lugenbuhl, Larzelere & Ellefson, Scott R. Wheaton, Jr., New Orleans, La., for plaintiff-appellee cross-appellant.

Before GOLDBERG, GEE and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This admiralty case arose out of an early-morning collision between two tows on the Mississippi River. After a bench trial the district court apportioned fault, awarded damages for repairs and loss of use, and expressly denied prejudgment interest.[1] Concluding that the apportionment of fault was not clearly erroneous, that the award of damages was supported by the evidence with one exception, and that the denial of prejudgment interest was within the trial court's discretion, we affirm the judgment in all respects save one.

Early on the morning of October 14, 1978, an empty five-barge tow was being propelled down the Mississippi toward Baton Rouge by the M/V LADY KIMBERLY.

At the same time, a tow consisting of eight barges and two survey boats was being propelled upriver toward Memphis by the M/V GEORGE B. CUMMINGS and the M/V VANCE M. THOMPSON. The CUMMINGS, which had the greater horsepower, was the lead tug, and the THOMPSON was the helper tug.

At around 3:40 a.m., the CUMMINGS flotilla approached Thomas Point, a hairpin turn in the Mississippi about ten miles above Baton Rouge. William Sheeks, the captain of the CUMMINGS, initiated radio communications with three downbound vessels, reaching agreements to hold against the red buoys along the left descending shore below the Point while all three vessels passed. The LADY KIMBERLY followed and Sheeks initiated radio contact with Glen Wilson, its pilot. With a passing agreement reached, the KIMBERLY tow proceeded around the Point.

As the KIMBERLY rounded the Point, Wilson observed the amber light on the bow of the lead barge in the CUMMINGS tow. At about the same time, Sheeks sighted the KIMBERLY tow. Realizing that a collision was imminent, both started an unsuccessful effort to back their vessels down. The lead barge on the CUMMINGS tow collided with the first two barges on the port side of the KIMBERLY tow.

Inland Oil and Transport Co., the owner of the five barges on the KIMBERLY tow, filed suit on August 23, 1979, against Ark-White Towing Co. and Augusta Barge Co., the owners and operators of the THOMPSON, and against Murphy Marine Service, Inc., the owner and operator of the CUMMINGS. The parties stipulated at trial that the THOMPSON had been under the control of the CUMMINGS and that Murphy Marine would assume liability of Ark-White Towing Co. and Augusta Barge Co.

Wilson testified that he had reached a passing agreement with Sheeks before rounding Thomas Point. According to Wilson, Sheeks said, "I'm on the red buoys

---

1. The district court's opinion on liability is reported at 514 F.Supp. 500 (E.D.La.1981). The opinion on damages is reported at 517 F.Supp. 651 (E.D.La.1981).

below Thomas Point for the one whistle, is that okay?" and Wilson replied, "Okay, see you on the one whistle." Wilson testified that as he rounded the Point, his tow was in the middle of the river, with his lead barge about 500–600 feet off the left descending shore, and that when the collision occurred, his tow was still about 500–700 feet off the left descending shore.[2] According to Wilson, the KIMBERLY tow was stopped at the time of the collision, but the CUMMINGS tow was moving forward.

Sheeks and Wilson differed in their recollection. Sheeks admitted radio contact with Wilson and the passing agreement to hold up along the buoys below the Point. According to Sheeks, though, his tow remained against the red buoys, which were 100 yards or so from the shore, moving little if at all. Sheeks testified that when he saw the KIMBERLY tow, it was near the left descending shore 300–400 yards above his tow. Sheeks testified that Wilson came on the radio and said, "Thought you were holding up," and he replied, "I am." Later on Sheeks testified that he never heard Wilson say anything to him about holding up below the Point. According to Sheeks, the head of his tow was less than 100 yards from the left descending bank at the time of collision.

Richard Coley, pilot of the THOMPSON, generally confirmed Sheeks' account as to the location of the two tows at the time of collision, but in a key passage disputed Sheeks' version of his conversations with Wilson. According to Coley, after the KIMBERLY tow had rounded the Point, Wilson said, "I thought you were going to hold up," and Sheeks replied, "You told me to keep coming."[3]

The parties stipulated as to the cost of the repairs to Inland Oil's two barges but tried damages for loss of use. Inland Oil put into evidence two towing orders: one,

dated October 9, 1978, included the two barges; the other, a revision dated October 16, 1978, omitted the two damaged barges but listed another smaller barge that was not on the earlier order. Because of the revision Inland Oil lost revenue since it was being paid a predetermined rate per net ton per mile. An assistant treasurer of Inland Oil testified that the lost revenue was equivalent to lost profits, because virtually all the costs of the Chevron towing contract were fixed costs, but could not say why the contract had been modified.

The district court found that the CUMMINGS had violated the passing agreement by failing to maintain its position along the left descending bank. 514 F.Supp. at 502. It also found that the KIMBERLY was "somewhat negligent" in navigating its tow too close to the left descending bank. Id. at 503. It apportioned 75 percent of the fault to the CUMMINGS and 25 percent to the KIMBERLY. Id. at 502.

In supplemental findings of fact and conclusions of law, 517 F.Supp. 651, the district court calculated damages for loss of use by adding $26,516.08, the lost revenue under the revised Chevron contract, to $16,515.98, an amount it obtained by prorating the Chevron contract rate over the additional days the two barges were in repairs, then rounding this sum off to $40,000, and multiplying it by 75 percent. When the district court entered judgment it crossed out terms in a draft judgment submitted by Inland Oil that ordered interest to be paid from the date of the collision, and instead ordered interest to be paid only from the date of judgment. This appeal and cross-appeal followed.

*Apportionment of Fault*

Murphy Marine challenges the district court's apportionment of fault. It argues that the district court erred in not finding

---

**2.** According to Wilson, the channel of the Mississippi (between the red buoys and the right descending shore) is 1500 feet wide at Thomas Point. According to Sheeks, it is "a good quarter" mile wide.

**3.** Coley and not Wilson heard this statement because, according to Coley, Sheeks picked up the wrong microphone and started talking on the frequency that the CUMMINGS and the THOMPSON had been using to communicate with each other.

the KIMBERLY negligent for negotiating Thomas Point at an excessive speed, in not finding that the KIMBERLY's failure to post a lookout on its lead barge was negligent and a contributing cause of the collision, and in not placing greater fault on the KIMBERLY for navigating too close to the left descending shore.

■ These challenges must surmount the clearly erroneous rule. *See Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1057 (5th Cir.1981); *Movible Offshore, Inc. v. M/V WILKEN A. FALGOUT*, 471 F.2d 268, 272–273 (5th Cir.1973).[4] We hold that they have not done so.

Murphy Marine points out that Wilson told the Coast Guard he had been approaching Thomas Point at 12.5 miles per hour. Murphy Marine argues that this was an excessive rate of speed under the circumstances and a violation of Rule 21 of the Western Rivers Rules of the Road. 33 U.S.C. § 346.[5] *See In re M/V FAY BLACKMAN*, 437 F.2d 542, 546 (5th Cir. 1971) (district court did not err in finding that tow violated Western Rivers Rules by travelling with the current at 12 to 14 miles per hour when aware that its contemplated course would require it to pass in close proximity to Big Black Point and another tow). At trial, however, Wilson explained that the statement referred to his average speed for the four hours prior to the collision and that he had actually cut his speed to half speed a mile above the Point.

■ Murphy Marine also contends that the KIMBERLY violated Rule 26, 33 U.S.C. § 351, in failing to post a lookout at the front of the tow. Wilson was stationed on the tug itself. He testified that the collision could have been avoided had he stopped 300 or 400 feet earlier. Since the head of the KIMBERLY tow was over 700 feet ahead of the tug, Murphy Marine argues that a lookout would have spotted the CUMMINGS tow in time to prevent the accident.

In order to be guilty of a statutory fault, however, the KIMBERLY must have been *negligent* in failing to provide a lookout at the head of the tow. "The question of a proper lookout is one of fact to be determined from all of the circumstances." *China Union Lines, Ltd. v. A.O. Anderson & Co.*, 364 F.2d 769 (5th Cir.1966), *cert. denied*, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). Murphy Marine offered no evidence as to whether posting a lookout at the head of a tow when entering a blind bend was customary. Inland Oil argues that given the clear weather Wilson had an excellent view from the wheelhouse, thirty-six feet above the deck level. *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d at 1053, in which this court affirmed a lower court finding that a tow had failed to post a proper lookout by not having anyone outside the pilot house in a thick fog, is distinguishable on its facts. *Savoie v. Apache Towing Co.*, 282 F.Supp. 876, 878 (E.D.La.1968), in which a tow was held at fault for not having a lookout stationed at the head of the tow when it came around a blind bend, indicates only that on similar facts one district court disagreed with the court below. We cannot say that the trial court's implicit finding of no negligence was clearly erroneous.

■ Murphy Marine also argues that the district court erred in not finding the KIMBERLY in violation of Rule 26 for failing to react as soon as the risk of collision became apparent. Murphy Marine here relies on the testimony of a KIMBERLY deckhand, who testified that Wilson had noticed the CUMMINGS' searchlight beam was getting brighter several minutes before he saw the amber light. This testimony was directly refuted, however, by Wilson's testimony and the credibility choice belongs to the trial court.

---

4. Although part of the case was submitted by deposition, Wilson did testify at trial. Therefore, the greater scope of review for cases submitted entirely by deposition is not applicable. *See Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1196 n. 6 (5th Cir.1982).

5. The Western Rivers Rules of the Road, 33 U.S.C. §§ 301–356, were repealed as of December 24, 1980, by the enactment of the Inland Navigational Rules, 33 U.S.C. §§ 2001–2073.

Finally, Murphy Marine argues that the district court erred in not allocating a greater degree of fault to the KIMBERLY for navigating too close to the left descending shore. The trial court's findings that Wilson and Sheeks had entered into a passing agreement requiring the CUMMINGS tow to hold below the Point, 514 F.Supp. at 501, and that the CUMMINGS had violated the agreement by not holding its position, *id.* at 502, are supported by the record, particularly the testimony of Richard Coley. Murphy Marine argues that the collision would not have occurred had the KIMBERLY been navigating where it was supposed to be. But the fact that the KIMBERLY's negligence was *one* but-for cause of the collision does not prevent the CUMMINGS' negligence from being *another* but-for cause. The district court's 75–25 apportionment of fault, following *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), may not be disturbed unless clearly erroneous. *See Allied Chemical Corp. v. Hess Tankship Co. of Delaware,* 661 F.2d at 1057. It was not.

### Loss of Use

Murphy Marine's second line of attack is directed to the sufficiency of evidence to support the awarded damages for loss of use.

Inland Oil proved that a towing order with Chevron was modified two days after the collision: the two damaged barges were removed and a smaller barge was added, resulting in a loss of revenue for Inland Oil. As Murphy Marine points out, however, Inland Oil offered no proof that the contract tonnage was reduced *because of* the temporary loss of the two barges. While Inland Oil's proof was hardly compelling we think the award for loss of this use was adequately supported by the record.

The trial court was entitled to infer from the two towing orders, the second of which was issued two days after the collision, that the modification had occurred because of the collision. Having drawn this inference, the court had before it the testimony of Inland Oil's assistant treasurer that lost revenues resulting from a contract modification of this kind were the equivalent of lost profits.

Murphy Marine argues that two other barges were available and could have been used. According to Inland Oil's records, however, one of the two barges was picked up during the period of the contract and taken to Cairo, Illinois, and the other was idled for repairs and a Coast Guard inspection. Thus, there was sufficient support in the record for $26,516.08 of the trial court's award of damages for loss of use, which it then multiplied by 75 percent.

The district court's award of damages is however insupportable in one respect. The assistant treasurer calculated that Inland Oil was entitled to an additional $16,515.98 for the time period the two barges were in repair after the expiration of the Chevron contract. He arrived at this figure by prorating the lost revenues from the Chevron contract over this additional time period.[6] The trial court, evidently convinced by this analysis, determined that the total loss of use was $40,000. We are not equally convinced. There is no evidence that the two barges *would have been used* during this time span. The assistant treasurer claimed that Inland Oil's records showed no excess capacity at the time the two barges were being repaired, but could not say whether the two barges would have been under contract had they not been in the shop. "[A] plaintiff is entitled to recover income lost as a result of a collision where the loss can be proved with reasona-

---

6. The lost revenue from the modification to the Chevron contract amounted to $26,516.08. The capacity of the larger of the two damaged barges was 2471 net short tons; that of the smaller was 1518 net short tons; the total capacity was 3989 net short tons. The larger barge was down an additional ten days following the expiration of the Chevron contract, the smaller barge was down an additional five days. Inland Oil's assistant treasurer multiplied $26,516.08 by 10/13 by 2471/3989, then multiplied $26,516.08 by 5/13 by 1518/3989. The sum of these two figures was $16,515.98.

ble certainty...." *Delta Marine Drilling Co. v. M/V BAROID RANGER,* 454 F.2d 128, 130 (5th Cir.1972). There was no reasonable certainty here. As in *Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc.,* 480 F.2d 1104, 1106 (5th Cir.1973), the award rested only on "surmise and conjecture." Accordingly, we reverse $10,112.94 of the trial court's award of damages for loss of use, that is, 75 percent of the difference between $40,000 and $26,516.08.

### Prejudgment Interest

Inland Oil's cross-appeal raises the recurring issue of when prejudgment interest may be denied in admiralty cases. "As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 728 (5th Cir. 1980). "Such an award, although within the Court's sound discretion, is well-nigh automatic in suits in the admiralty." *Masters v. Transworld Drilling Co.,* 688 F.2d 1013, 1014 (5th Cir.1982). "Discretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d at 728. "Discretion to deny interest must be based on the existence of peculiar circumstances." *Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1217 (5th Cir.1980) (quoting *American Zinc Co. v. Foster,* 441 F.2d 1100, 1101 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971)).

In our review of the district court's denial of prejudgment interest, we are guided by the principles of *Noritake Co. v. M/V HELLENIC CHAMPION:*

If the trial court *explicitly denies* prejudgment interest (rather than merely omitting any reference to it), then this is based on a factfinding that peculiar circumstances exist; the factfinding is sometimes explicitly set out, with the peculiar circumstances detailed in the court's findings of fact and conclusions of law, or it may be implicit in the denial of prejudgment interest without a listing of the circumstances. If the trial court was not clearly erroneous in finding that peculiar circumstances exist, then its denial of prejudgment interest was discretionary. In most instances, we have not found such a denial to be an abuse of discretion. [Citations omitted.] In a few instances, the appellant has convinced this court that an explicit denial of prejudgment interest was an abuse of discretion. [Citations omitted.]

627 F.2d at 729–730 (emphasis in original).

■ Here the district judge expressly declined to award prejudgment interest. He crossed out the two clauses awarding interest "from October 14, 1978," in the draft judgment submitted by Inland Oil, and substituted interest "from date of judgment."[7] He also denied in writing Inland Oil's motion to reconsider the denial of prejudgment interest. Thus, the issue we must resolve, following *Noritake,* is whether the district court's implied finding of peculiar circumstances was clearly erroneous.[8]

■ Generally, peculiar circumstances fall into three categories: (1) "plaintiff's delay in bringing suit"; (2) "the existence of a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved"; (3) "judgment in an amount substantially less than

7. The crossing-out appeared in the original judgment of August 13, 1981. On motion of Ark-White Towing, an amended judgment was handed down September 3 in which references to Ark-White Towing and the THOMPSON were deleted. This amended judgment simply ordered interest to be paid "from date of judgment."

8. We reiterate here what we said in *Noritake:* "Of course, in any admiralty case in which the trial court refuses to award prejudgment interest, the best practice would be for it to detail the peculiar circumstance it has found, and specifically indicate that it is denying prejudgment interest as an exercise of the discretion created by the existence of peculiar circumstances." 627 F.2d at 729 n. 4.

that claimed." *Mecom v. Levingston Shipbuilding Co.,* 622 F.2d at 1217. We doubt that either the first or third circumstance is present here. Inland Oil filed suit eight months after the accident. *Cf. Mecom v. Levingston Shipbuilding Co.,* 622 F.2d at 1217 (plaintiff filed suit two years and eight months after barge sank). In its complaint Inland Oil estimated its damages at $85,000, an amount not disproportionately greater than the district court's judgment, as affirmed.

Our focus must therefore be on the second factor, "the existence of a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved." This second factor, also described as "a genuine dispute over a good faith claim in a mutual fault setting," *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d at 728 n. 3, has not been defined precisely by past decisions. Inland Oil argues that because a "serious dispute" occurs any time there is a trial on the merits, this cannot be a justification for denying prejudgment interest. Yet a finding that a plaintiff was partially at fault weakens his equitable claim that his funds have been withheld by a recalcitrant party. Not surprisingly then, our cases have consistently upheld denials of prejudgment interest in cases of apportioned fault.

Thus, in *Nat G. Harrison Overseas Corp. v. American Tug Titan,* 516 F.2d 89 (5th Cir.1975), this court affirmed a denial of prejudgment interest to a bargeowner whose claim against a stevedoring operation had been reduced 50 percent because of the barge's unseaworthiness: "[W]e think that the unusual circumstances of this case—the coordinate effect of improper stowage with an unseaworthy barge which caused the capsizing—brings it within the exception to the general rule allowing prejudgment interest in admiralty for property loss." *Id.* at 97.

More recently, in *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243 (5th Cir.1982), we upheld a denial of prejudgment interest in a personal injury suit brought by a longshoreman who had been found 40 percent contributorily negligent. "We cannot say that the judge's implicit finding that peculiar circumstances exist is clearly erroneous." *Id.* at 1248. The *Pluyer* opinion does not articulate the peculiar circumstances but they appear to include the fact that the plaintiff had been adjudicated 40 percent at fault. In *Ceja v. Mike Hooks, Inc.,* 690 F.2d 1191, this court reversed and remanded a "derivative finding" denying prejudgment interest after reversing and remanding a determination of 75 percent contributory negligence. We added, however, "In the proper case, a high degree of contributory negligence might well be considered by the district court in invoking its discretion to deny prejudgment interest." *Id.* at 1197.

We decline to define a Plimsoll line for the award of prejudgment interest expressed as an absolute percentage of fault. The apportionment of fault at its edges is inevitably an arbitrary but necessary drawing of lines. Tying prejudgment interest to a specific percentage would do little more than shift the focus of discretion. For this reason we decide that if the apportionment of fault is sustained on review by application of the clearly erroneous rule, the decision regarding prejudgment interest will not be disturbed if it has a rational fit in the resulting judgment viewed as a whole. There was a rational fit here.

Inland Oil urges us to adopt the reasoning of the Ninth Circuit in *Alkmeon Naviera, S.A. v. M/V MARINA L,* 633 F.2d 789 (9th Cir.1980). There the court held that the record showed no "peculiar circumstances," although the party seeking recovery had been found 40 percent at fault. In a footnote the court added:

Mutual fault is also occasionally listed as a reason for denying prejudgment interest.... [C]ourts have denied prejudgment interest in mutual fault cases in order to mitigate the harsh effects of the old equal division of damages rule. [Citation omitted.] These courts recognized that, in cases of slight negligence, prejudgment interest actually penalized the less culpable party....

The equal division of damages rule, however, was abrogated by *United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Thus, denial of prejudgment interest on mutual fault grounds would seem no longer necessary, since distortions in compensation can no longer occur.

*Id.* at 798 n. 12. The flaw in this analysis is that comparative fault has long been the rule in maritime personal injury actions. *See United States v. Reliable Transfer Co.,* 421 U.S. at 408 at n. 13, 95 S.Ct. at 1714 n. 13. Yet courts drew no distinction between denials of prejudgment interest in collision cases and such denials in personal injury cases. The Ninth Circuit's intimation that denials of prejudgment interest were somehow tied up with the rule of divided damages is not persuasive. We conclude that *Reliable Transfer* does not require reexamination of the law regarding denials of prejudgment interest.

In sum, we affirm the decision of the district court in all respects, except that part of the judgment awarding Inland Oil damages for loss of use for the time period after the termination of the Chevron contract as to which we reverse.

AFFIRMED AS MODIFIED.