**INTEROCEAN SHIPS, INC., a Delaware corporation, Plaintiff**

**v.**

**SAMOA GASES, a corporation, Defendant**

High Court of American Samoa
Trial Division

CA No. 123-85

May 2, 1994

Before RICHMOND, Associate Justice, and TAUANU`U, Chief Associate Judge.

Counsel: For Plaintiff, William L. Banning and William H. Reardon
For Defendant, Arthur Ripley, Jr. and Gata E. Gurr

Opinion and Decision on Damages:

This case revolves around an explosion which took place on the purse seiner Ocean Pearl on November 21, 1983. This action, the final phase of a bifurcated trial, is all that remains of a number of suits filed in various jurisdictions. Due to the long history of the action, we briefly recite the facts as laid out in the court's Opinion and Decision on Liability, issued on December 22, 1992.

On November 16, 1983, the purse seiner Ocean Pearl set sail on a fishing

voyage from Pago Pago, American Samoa. While on the high seas two days later, the diesel propulsion engine of the Ocean Pearl stopped, due to tainted fuel taken on in Pago Pago. For three days unsuccessful attempts were made to restart the stalled engine. On November 21, 1983, a now notorious attempt was made to restart the engine using a combination of ether-based starter spray and pure oxygen gas. After one encouraging try, the second attempt to so start the engine resulted in a low order explosion. The explosion damaged the engine and the engine room and severely burned six crew members and the captain, who eventually died of his injuries.

Subsequently, actions were filed by the injured crew members and the widow of the Ocean Pearl's captain, naming Interocean Ships, Inc. ("Interocean") as defendant. Each of these claims was settled by Interocean, which in turn brought actions against the companies that supplied the diesel fuel, the starter fluid, and the oxygen. Both the actions against the suppliers of the diesel fuel and the starter fluid were settled, and the remaining suit against the supplier of the oxygen, Samoa Gases, proceeded to trial on October 7-9, 1992.

The court bifurcated the trial, addressing first the liability of Samoa Gases, if any, and reserving the determination of damages until now. At the first phase of the trial, the court, for the first time, applied the doctrine of strict products liability to an admiralty proceeding. The court found that Samoa Gases' failure to provide a warning label on the oxygen cylinders rendered the oxygen unreasonably dangerous and was a proximate cause of the explosion. Applying the principles of comparative fault, the court held Samoa Gases liable in proportion to the amount by which its fault furthered the accident. Reserving the question of damages for the second part of the bifurcated trial, the court did find that the crew, and therefore Interocean, should bear a significant quantum of responsibility for the accident, as they should have known of the danger of using pure oxygen. The court left the question of allocating percentage of fault between Samoa Gases, the crew of the Interocean, and the suppliers of the diesel fuel and starter fluid for the damages phase of the trial, and it is to these questions that we now turn.

This second phase of the trial, itself divided into two parts, took place on July 14-15, 1993 and December 13-15, 1993. Interocean requested total damages of between $2,373,962.88 and $2,578,962.88 (depending on the method of lost profits calculation, and excluding the request for prejudgment interest). The claims are requested for: (1) lost profits; (2) maintenance and cure payments made to the crewmen; (3) settlement

30

payments made to the crew and the widow of the captain; (4) damage and repair costs; (5) attorney's fees and costs incurred in collateral litigation; and (6) prejudgment interest. We will address each aspect of the requested damages in turn, addressing first the question of apportioning liability between the parties.

At the close of trial, Interocean requested Samoa Gases be held liable for at least 50% of the damages, and not less than 25%. Samoa Gases requested that their liability be assessed at 0% of the damages, and not more than 1%. In order to most accurately determine the percentage of fault of each player, we examine the causal roles played by both parties to this action, as well as by PRI (supplier of the diesel fuel) and Radiator Specialty (supplier of the starter fluid, THRUST). Once percentages of fault are established, the dollar amounts actually paid by settling third parties are disregarded and liability is calculated pro rata.

## COMPARATIVE LIABILITY

Assessing first the roles played by PRI and Radiator Specialty, we note that suits against each of these suppliers never came to trial. However, the defendant was given the opportunity, at the second phase of the trial, to introduce evidence regarding the comparative fault of nonparties.

■ There has been no evidence submitted as to the liability, if any, of Radiator Specialty. Save for the fact of their settlement, which could be attributed to a variety of factors not pertaining to liability, this court has heard nothing more than allusions as to their liability. The chief engineer testified, without contradiction, that he had used THRUST at least twice after the engine stopped working and prior to the explosion, with no discernible results at all (Deposition of Richard M. Gonsalves, December 19, 1990, p. 34-37). Samoa Gases's own witness, Andy Nesheim, testified that using THRUST as done by the crew of the Ocean Pearl was the proper thing to do, and is done all the time at Samoa Gases (Transcript, October 9, 1992, p. 11). There was no admissible evidence regarding the labeling of THRUST, or showing that the product was unreasonably dangerous. In the absence of any even minimally probative evidence tending to show that Radiator Specialty bore some quantifiable measure of responsibility, we decline to arbitrarily guess what that percentage may be. Therefore, the percentage of liability assessed to Radiator Specialty is zero.

The evidence relating to the liability of PRI, the fuel supplier, was less speculative. While all parties seem to take it for granted that the fuel was

31

in fact tainted, and therefore the cause of the engine's failure in the first place, there was little proof before the court as to this fact.[1] While fuel contaminates may have been a problem, at least at first, whether or not this was due to the negligence of PRI or Interocean remains unclear. However, the fuel tanks were drained and refilled with what was thought to be "good fuel" and the engine still did not start (Deposition of Richard M. Gonsalves at 27). While it seems clear that PRI played some minimal part in the accident, the evidence does not reveal that it was a large role. Additionally, whatever their contribution may have been, the fuel itself did not cause the explosion. With all this in mind, we assess the liability of PRI at 1%.

We now look at the percentage of damages to be assessed against the two remaining players before the court - Interocean and Samoa Gases. We begin with Interocean.

Throughout all phases of this litigation, Interocean has never maintained that it was blameless. Indeed, it stated that it bears some measure of responsibility for the explosion, differing with Samoa Gases only as to how much. Interocean's liability can be traced to two separate roots: the condition of the engine and the negligence of the crew. There is evidence showing that the engine itself was not functioning properly prior to the breakdown.[2] Additionally, there was some evidence that the manner of fuel storage may have led to its contamination, and that the engine itself was poorly maintained (Transcript, December 14, 1993, p. 68).

Even more important is the obvious negligence of the crew. As defendants noted, this crew was not new to the sea, nor were they

---

[1] The chief engineer testified that he initially thought there was a problem with the fuel and he changed the fuel filters, to no avail. He also changed 5 (out of 20) fuel injectors he found to be "sticking," also with no effect. The fuel pressure was found to be sufficient and the chief engineer concluded that the fuel was not the problem (Deposition of Richard M. Gonsalves, December 19, 1990, p. 24-27).

[2] The chief engineer testified that when he first joined up with the Ocean Pearl on November 16th the departing chief engineer, Walter Cook, indicated that the engine had shut itself down when operating at high speed (Deposition of Richard M. Gonsalves, December 19, 1990, p. 17-19). Joseph Yandall testified that from his review of the evidence the Ocean Pearl left on its fateful voyage with a very faulty engine (on voir dire, transcript, December 12, 1993, p. 68).

unfamiliar with proper uses of oxygen.[3] While Samoa Gases had the responsibility to label the oxygen cylinders, the captain and crew certainly had the responsibility to handle all materials in a workmanlike manner.

Because of Interocean's both passive and active roles in bringing about the explosion, we assess their degree of liability at 95%.

The final participant, then, is the defendant before us, Samoa Gases. As the court concluded after the first part of the bifurcated trial, the lack of warning labels on the oxygen cylinders rendered the oxygen unreasonably dangerous and was certainly a proximate cause of the accident. However, within the particular fact situation before us, we cannot say that Samoa Gases bears the primary responsibility for the explosion.

Therefore, we assess the liability of Samoa Gases at 4%. With these percentages of fault in mind, we now turn to each category of damage claimed by Interocean.

---

[3] The Captain, John Medina, came from a fishing family (Transcript, October 7-8, 1992, p. 161). The chief engineer, Richard Gonsalves, stated in his deposition that he attended junior college and the University of San Diego and began his fishing career in 1973. He passed examinations and received Coast Guard licenses as an assistant engineer and chief engineer, and served as a chief engineer for four years before coming to the Ocean Pearl. He testified that the boats he served on prior to the Ocean Pearl were of similar tonnage and had identical engines, and that his duties on them were similar in scope to those on the Ocean Pearl (Deposition of Richard M. Gonsalves, December 19, 1990, p. 7-12).

33

# LOST PROFITS

Lost profits are estimated by Interocean to be either $405,000.00 or $610,000.00, depending upon the method of calculation employed (average catch per day or profit per trip). Because of our finding in this area, it is unnecessary to determine which method, if either, should in fact be utilized.

■ Interocean is claiming that the loss of profits on this particular trip was due to the fault of Samoa Gases in not labeling the oxygen cylinders, and in causing the explosion. While we acknowledge that "(I)n admiralty it is well settled that fishing vessel owners and commercial fishermen may recover for lost fishing profits under the general maritime law of negligence.", *Jones v. Bender Welding & Mach. Works, Inc.*, 581 F.2d 1331, 1337 (9th Cir. 1978) (citations omitted), this is not the type of case that lends itself to this recovery.

■ Cases that have allowed recovery of lost profits have done so when a defendant's actions were the proximate cause of the loss. In *Jones, supra*, the court found that overall there was no intervening cause between defendant's actions and plaintiff's losses (finding otherwise that plaintiff was entitled to pursue these damages, without ruling on whether they would be awarded on remand). In *Reefer Queen Co. v. Marine Construction & Design Co.*, 440 P.2d 453 (Wash. 1968), a case where plaintiff lost 11 fishing days out of an otherwise successful fishing voyage due to faulty winches, the court noted that the lost profits calculation was based on not only plaintiff's expert witness testimony but on evidence as to the fish the vessel was catching immediately prior to and in between breakdowns. The court pointed out that the failure of the winches was due to defective shafts (and therefore defendant's negligence), and that once this problem was addressed, there was no further trouble. In *Miller Indus. v. Caterpillar Tractor Co.*, 473 F. Supp. 1147, 1156 (S.D. Ala. 1979), appeal after remand 516 F. Supp. 84 (S.D. Ala. 1980), the court, in computing lost profits in a case where the defendant's actions were the only, and proximate, cause of the lost profits, said "This (computation of lost profits) includes a comparison to similar vessels engaged in the same fishery in the same general area as would have been fished by plaintiff *but for* the fault of the defendants." (emphasis added). In each of these cases, and others, lost profits were awarded when a defendant's actions were the direct cause of the loss. Additionally, while lost profits do not have to be calculated exactly, they generally must be "proved with reasonable certainty." *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1000 (5th Cir. 1984). application for rehearing den'd in part 753

34

F.2d 378 (5th Cir. 1989). This computation certainly cannot automatically transform a failing voyage into one where lost profits are at all recoverable.

In this case, Samoa Gases' failure to label the oxygen cylinders has been found to be a proximate cause of the explosion, but we cannot say that the explosion was the primary reason for the Ocean Pearl's loss of profits on the voyage under scrutiny. Prior to the explosion, the vessel had been adrift on the seas for three days, through no fault of Samoa Gases, with no demonstrated ability to extricate herself from this predicament. Various methods had been tried by the crew and, as both parties agree, to no avail. While the explosion itself was proximately responsible for other damages, it was not the "but-for" cause of the lost profits. Indeed, from this court's observance of the evidence, it seems that this voyage would have resulted in the Ocean Pearl's being towed to shore without completing its fishing expedition whether or not the explosion had taken place.[4] The explosion does not negate the fact that the voyage was unprofitable, nor does it turn an unprofitable trip into a lucrative one. To allow Interocean to recover lost profits from what was turning out to be an unsuccessful voyage, simply because of a subsequent event that, at most, added to its failure, would be palpably unfair. Therefore, the only evidence before us tends to establish that the breakdown of the engine, and the inability to fix it, was the proximate cause of the lost profits.

In the absence of any evidence illustrating that the engine was going to be repaired, save for the intervening explosion, we cannot, and do not, hold Samoa Gases liable for lost profits.[5]

### MAINTENANCE AND CURE

Interocean seeks indemnity for maintenance and cure payments made to

---

[4] Whether or not Interocean is able to pursue a claim against those responsible for the engine failure, and for the subsequent lost profits, is not before the court at this time, and we decline to comment on it.

[5] In any event, had we found the explosion to be the direct cause of transforming an otherwise profitable fishing voyage into a loss, we would have held Samoa Gases liable only to their percentage of fault. *Miller Indus. v. Caterpillar Tractor Co.*, 473 F. Supp. 1147, 1156 (S.D. Ala. 1979) appeal after remand 516 F. Supp. 84 (S.D. Ala. 1980) (holding negligent actors liable for lost profits to their individual degree of fault).

the injured crew members in the total amount of $241,935.06.[6] This figure is made up of expenses related to medical payments, ambulance receipts, food bills and telephone charges. In support of these payments, Interocean submitted receipts, copies of canceled checks and invoices. Samoa Gases did not dispute these payments with any evidence.

For the cure payment of each injured crew member Interocean submitted copies of canceled checks made out to Hawaii's Straub Clinic and Hospital, American Ambulance Service, various medical personnel and mileage reimbursements to and from doctors.[7] Additionally, maintenance checks were also made out to each crew member.[8] We have itemized the maintenance and cure payments expended to each crewman in the chart below:

| Crew Member | Maintenance | Cure |
| --- | --- | --- |
| Situa Brown | $1,284.00 | $23,453.53 |
| Afamiliona Faatasiga | 3,132.00 | 34,986.91 |
| Deok Gon Kim | 3,132.00 | 31,359.64 |
| Tae Hong Kim | 6,768.00 | 43,041.74 |
| Antonio Lolesio | 5,040.00 | 41,481.71 |
| Robert Parkerson | 7,140.00 | 41,115.53 |
| Total | $26,496.00 | $215,439.06 |

■ Maintenance and cure are entitlements that have certainly withstood the tests of time and judicial scrutiny. "In fact, the duty of the shipowner to provide for the ill or injured seaman can be traced as far back as the Sea Codes of the Middle Ages." *Rutherford v. Sea-Land Service, Inc.*, 575 F. Supp. 1365, 1369 (N.D.Cal. 1983), *citing* 2 Norris, *The Law of Seamen*, § 540 (1970). A seaman is entitled to maintenance and cure whether or not the injuries were received as a result of negligence. *The Osceola*, 189

---

[6] Interocean actually requested maintenance and cure in the amount of $233,203.99. However, the payments made add up to the higher figure given. As there was no evidence regarding any lowering or subtraction of amounts, we assume the figure given by Interocean was error.

[7] Cure payment receipts were admitted to the court as plaintiff's exhibits 19A through 19F.

[8] Maintenance payment receipts were admitted to the court as plaintiff's exhibits 20A through 20F.

U.S. 158, 47 L. Ed. 760 (1903) (superseded by statute on other grounds as stated in *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524 (5th Cir. 1979) and on remand 89 F.R.D. 322 (1980)). This right, to recover maintenance and cure without regard to fault, is among the most pervasive incidents of the responsibility anciently imposed upon a shipowner. *Anguilar v. Standard Oil Co.*, 318 U.S. 724, 730, 87 L. Ed. 1107 (1943).

■ A shipowner does have a right of indemnity against a third party tortfeasor for maintenance and cure paid to an injured seaman. *Black v. Red Star Towing & Transp. Co., Inc.*, 860 F.2d 30 (2nd Cir. 1988). We ask, although the issue was not explicitly raised by the parties, if a shipowner whose negligence has contributed to the injury pays maintenance and cure to a contributorily negligent seaman, is that shipowner entitled to contribution for maintenance and cure from a third party joint tortfeasor, also held to be at fault? The answer here is also yes. The third party should contribute the portion of maintenance and cure proportionate to fault. "[A] party whose neglect has in part contributed to the need for maintenance and cure payments . . . should reimburse the costs of those payments to the extent occasioned by its fault." *Adams v. Texaco Inc.*, 640 F.2d 618 (5th Cir. 1981). "We think that equity, as well as good sense, should serve to limit the liability of a third-party tortfeasor to its proportionate share of fault in all cases where reimbursement is sought for maintenance and cure." *Black, supra*, 860 F.2d at 34. The fact that the claims for maintenance and cure were settled prior to trial does not bar contribution by Samoa Gases. *Rogers v. New Jersey Barging Corp.*, 567 F. Supp. 822 (S.D.N.Y. 1983) (citations omitted).

We hold Samoa Gases liable for maintenance and cure payments equal to the amount of their assessed liability of 4%. On this element of damages, therefore, it is liable in the amount of $9,677.40.

## SETTLEMENT PAYMENTS

Interocean settled claims made against them by the injured crew members and the widow of the captain, and now seeks to be reimbursed by Samoa Gases.[9] In support of these amounts, Interocean submitted copies of settlement checks, releases and court documents (before this court and others). There has been no evidentiary dispute as to the amounts actually

---

[9] Neither party submitted detailed briefs on the topic. However, as the issue of settlement payments was treated by both parties as an aspect of requested damages, we address the issue in full.

paid. The settlement payments made are detailed below:

| Crew Member | Settlement Amount |
|---|---|
| Situa Brown | $67,500.00 |
| Afamiliona Faatasiga | 135,000.00 |
| Deok Gon Kim | 105,000.00 |
| Tai Hong Kim | 165,000.00 |
| Antonio Lolesi | 150,000.00 |
| John Medina | 100,000.00 |
| Robert Parkerson | 185,000.00 |
| Total | $907,500.00 |

 It is true that "admiralty law recognizes that even where a party to a lawsuit settles, it may still bring an indemnity action against a joint tort feasor". *Sea-Land Service, Inc., v. American Logging Tool Corp.*, 637 F. Supp. 240, 241 (W.D. Wash. 1985). We note that in 1985 Samoa Gases rejected Interocean's tender of defense of the personal injury and wrongful death claims (Transcript, December 14, 1993, p. 2). However, a failure to tender, alone, would not preclude an indemnity claim by Interocean, if that claim still presented a valid theory of relief. *National Marine Service, Inc., v. Gulf Oil Co.*, 433 F. Supp. 913, 916 (E.D. La. 1977) (citations omitted).

 Throughout the damages phase of the litigation, Interocean stressed that the settlement payments made were reasonable and, if anything, were low. Samoa Gases presented no evidence showing that the settlement payments were unreasonable in amount. Examining the photographs and testimony concerning the injuries received from the explosion, this court must agree. We have also been presented with little evidence as to the liability of Interocean to the settling crew members. However, it is not difficult for us to find, based on the voluminous material before the court, that Interocean would have been held liable, as our finding of its liability in the matter before us supports. The fact the crew themselves contributed to the injury does not preclude recovery by Interocean, if they were liable as well. *West Coast Ter. Co. of Cal. v. Luckenbach SS Co.*, 349 F.2d 568 (9th Cir. 1968) (shipowner's action against stevedore for breach of indemnity contract). We also recognize the slight degree of fault that would render Interocean responsible to a Jones Act plaintiff. *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975); *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1542 (11th Cir. 1989). Therefore, we find that the settlements were not voluntary payments. Cases finding a third party

38

tortfeasor liable for all, or partial, payments to one who has reached a settlement with crew members have then looked to the reasonableness of the amounts paid. *Wisconsin Barge Line, Inc. v. Barge Chem 300*, 546 F.2d 1125 (5th Cir. 1977).

In the case before us, we find that the settlements paid by Interocean and detailed above were all reasonable. Samoa Gases has already been held strictly liable and its degree of fault established at 4%. Following the principle of having each party bear their share of fault, *Cooper Stevedoring Co. v. Kopke*, 417 U.S. 106, 40 L. Ed.2d 694 (1974) (dividing liability equally in a non-collision case as proper under the circumstances), we hold Samoa Gases liable for 4% of the settlement payments made to the injured crew and the widow of the captain. Samoa Gases is to pay $36,300.00 in this area of damages.

## DAMAGE AND REPAIR COSTS

Interocean claims damage and repair costs attributable to the explosion of $53,338.33, out of a total damage and repair cost of between $132,417.39 and $157,378.54. The damage and repair costs assigned by Interocean to the explosion consist of the following charges: turbo charger at a cost of $30,624.52; helicopter costs of $10,293.25; one-fourth repair crew costs of $3,137.50 and $2,349.90; one-fourth travel at a cost of $3,074.05; phone charges at a cost of $139.29; and miscellaneous charges of $2,657.87. These amounts were explained and checked for reasonableness by Kenneth F. Franke, a marine surveyor who investigated the Ocean Pearl's casualty and recommended repairs.[10]

On this issue, there was conflicting testimony as to what was actually damaged and how much repairs should have cost. While Interocean claims that the turbocharger was damaged by the explosion, there is evidence that it was not properly working prior to the explosion (Deposition of Richard M. Gonsalves, December 1990, p. 32-33) (prior to explosion, the chief engineer applied a test to see if the turbocharger was working and could not tell from the results if it was). Joseph Yandall testified that he felt the turbocharger was in poor shape and not properly functioning prior to the explosion. Specifically, he noted an imbalance of heat in the exhaust barometer readings from the engine, the presence of water in the fuel, sticking of the fuel injectors and the valves not being

---

[10] *See* Deposition of Kenneth F. Franke, November 7, 1991, San Diego California, and attendant exhibits. We note that the defendant was not present at the deposition, although they had sufficient notice and opportunity.

seated properly (Transcript, December 14, 1993, p. 102, 106). Mr. Yandall felt that it would have taken the same amount of time to repair the engine had the explosion never occurred and that some elements of the engine, (i.e., the blow-out covers) could have been repaired instead of replaced.

We first address the costs attributed to travel, repair crews, helicopter, phone and miscellaneous charges. On these issues there was little, if any, contradiction. Interocean submitted these costs, and then subtracted what they felt could not be attributed to the explosion itself. While Samoa Gases lodged a "general protest" against these charges, there was nothing approaching particularity for any challenges. From our review of the extensively documented record, it appears that these costs at least were reasonable and attributable to the explosion.

The record is not so clear as regards the turbocharger. While there was undoubtedly additional damage done to it due to the explosion at issue, the record is equivocal at best regarding its functioning just prior to the explosion. In sum, we have evidence before us stating that the turbocharger probably did work, probably did not work, and may have worked prior to November 21, 1983. From our review of the record, we can ascertain that the turbocharger, while not functioning properly, was certainly affected by the explosion itself. Therefore, we assess the damages to the turbocharger attributable to the explosion at 50% of its total damage, or $15,312.26.

 We are mindful that we should allocate damages liability in proportion to relative fault. *United States v. Reliable Transfer*, 421 U.S. 397, 44 L. Ed.2d 251 (1975). Therefore, we assess Samoa Gases liability in this area at 4% of $36,964.12, or $1,478.56.

### ATTORNEY'S FEES AND COSTS

Interocean is claiming attorney's fees and costs as damages arising out of suits brought against it by the crew members and the widow of the captain in connection with the explosion. The total amount of attorney's fees claimed is $611,575.00, and the amount of costs is $154,597.00, for a total claim of $766,172.00.[11] Interocean, in support of the claimed

---

[11] At several points throughout the litigation there was confusion on the part of Interocean as to the total amount of claimed attorney's fees and costs. Our figures reflect the final ones given during the second half of the trial's second phase on December 14, 1993.

amount, submitted multiple invoices documenting the dates, descriptions, time and value of all services related to this claim, as well as a summary of this voluminous material. In response, Samoa Gases, while not challenging the doctrine or the legal authorities relied upon by Interocean, simply disputes any award. This position is bolstered by Samoa Gases' two-pronged assertion:

> (1) first, that Interocean submitted insufficient evidence to prove that attorney's fees and costs were incurred and/or paid; and (2) second, that fees and costs that were paid were already reimbursed by the settlement amounts from PRI and Radiator Specialty.

In this case, Interocean's submissions as to the amount of attorney's fees and costs must stand. Samoa Gases has submitted no proof going to the reasonableness of the fees and costs, any deficiency with Interocean's accounting system, any padding, or indeed any other evidence that would show that the costs themselves are unreasonable. With nothing to show that these fees and costs are anything other than what Interocean has submitted them to be, we accept them as offered.

Samoa Gases' assertion that Interocean's award in this area must fail due to settlements received from PRI and Radiator Specialty is without merit. This court has previously stated that the settlements reached with these parties is inadmissible. (Opinion and Interim Orders, September 3, 1993, p.5).

However, there are other difficulties with Interocean's request. While it is trite law that attorney's fees, in general, are not awarded, we acknowledge that there are exceptions to that rule. The general rule is ". . . against recovery of attorney's fees as such, by a party which incurs them in enforcing a claim against another. It is equally well settled, however, indeed it is hornbook law, that the reasonable expenses incurred by an indemnitee in defending a claim against him may be recovered of his indemnitor--and that these expenses include attorney's fees." *Cotten v. Two "R" Drilling Co., Inc.*, 508 F.2d 669, 771 (5th Cir. 1975). This exception applies equally to courts sitting in admiralty, as it has been specifically held that admiralty courts have such equitable powers as to assess attorney's fees. *McKeithen v. S.S. Frosta*, 426 F. Supp. 307 (E.D. La. 1977) (pretrial order addressing discovery). However, we also note that "The prevailing party in an admiralty case is generally *not* entitled to an award of attorney's fees, absent statutory authorization." *B.P. North America Trading v. Vessel Panamox Nova*, 784 F.2d 975, 977 (9th Cir.

41

.1986) (emphasis added) (citations omitted); *see also In Re Sause Bros. Ocean Towing*, 801 F. Supp. 378, 380 (D. Or. 1991) (the American Rule .requiring parties to bear their own attorney's fees generally applies in admiralty).

█ This case, however, does not fall into the exception as advocated by Interocean. Here Samoa Gases would, at most, only be held liable for attorney's fees equal to their percentage of fault and would not in any event fully indemnify Interocean.[12] And as we hold today, Samoa Gases is responsible for contribution as regards damages caused by. the explosion and settlement amounts paid. In this type of situation, attorney's fees and costs, between responsible parties, are not recoverable. *Western Tankers Corporation v. United States*, 387 F. Supp. 487 (S.D.N.Y. 1975). In *Odds Bergs Tankrederi A/S v. S/T Gulfspray*, 650 F.2d 652, 653 (5th Cir. 1981), the court stated: "In cases where contribution has been allowed for damages, both in admiralty and nonadmiralty, courts have generally denied a right to contribution for attorney's fees and expenses incurred in defense of the action brought by the injured party (citations omitted)."

Here, although we awarded Interocean contribution, we have found from the evidence before us that it bears the vast majority of liability in this case. Cases have found that a party who is at fault, while defending against a victim's claim, cannot then turn to another liable party for attorney's fees in the first suit. *Leingang v. Bottled Gas Corporation*, 332 F.2d 959. (7th Cir. 1964). We agree with this reasoning, particularly where the original defendant is found significantly responsible.

In the case before us, Interocean would have had to defend against the claims, and incur attorney's fees, regardless of the role of Samoa Gases. While Samoa Gases may have garnered an indirect benefit from Interocean's actions, that alone does not make them liable for attorney's fees.[13] Indeed, our entire opinion makes clear that each party should be

---

[12] *Ohio River Company v. Great Lakes Carbon Corporation*, 714 F.2d 65 (8th Cir. 1983). This follows the tradition of courts sitting in admiralty and attempting to have assessments of liability be based on fault. In *United States v. Reliable Transfer*, the court, in replacing the admiralty rule of divided damages (in collisions or stranding) with a rule requiring, when possible, allocation of liability in proportion to relative fault, noted "The (old) rule produces palpably unfair results (where fault is not equal)." 44 L. Ed 2d 251, 259, 421 U.S. 397 (1975). In this case, fault is clearly not equal.

[13] We note the possible distinction when the original plaintiff is awarded costs, and the original defendant then seeks contribution against a third-party tortfeasor. *See Seal Offshore, Inc. v. American Standard, Inc.*, 777 F.2d 1042 (5th Cir. 1985). However, that is not the

held liable to their degree of fault. Here Interocean would have litigated, and settled, these claims regardless of the fact that any other parties may be held partially liable, and benefited themselves from the settlement, so attorney's fees are unrecoverable in contribution. *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190 (5th Cir. 1989); *see also Lennon v. Aluminum Company of America*, 279 F. Supp. 487 (S.D. Iowa 1968); *Rauch v. Senecal*, 112 N.W.2d 886 (S.D. Iowa 1962).

Therefore, Interocean is not entitled to attorney's fees or costs incurred in this collateral litigation. We hold that Samoa Gases is not liable for them in any amount.

## PREJUDGMENT INTEREST

Interocean has requested an award of prejudgment interest and asked that this be calculated by setting a constant rate of interest based on a rate equal to the coupon issue yield, as determined by the Secretary of the Treasury, of the average accepted auction price for the last auction of 52-week United States Treasury Bills settled immediately prior to the date of the explosion (Interocean's Supplemental Bench Brief Regarding Recoverability of Prejudgment Interest in Maritime Law, July 13, 1993).

■ We acknowledge the fact that the general rule is to award prejudgment interest, although this award always lies soundly within the court's discretion. *Masters v. Transworld Drilling Co.*, 688 F.2d 1013, 1014 (5th Cir. 1982) (citations omitted); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157 (5th Cir. 1990). However, it is also true that when certain "peculiar" circumstances exist, the discretion to deny prejudgment interest is sustained. *Noritake Co. V. M/V HELLENIC CHAMPION*, 627 F.2d 724, 728 (5th Cir. 1980); *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir. 1992). These peculiar circumstances have fallen into three categories: (1) "plaintiff's delay in bringing suit," (2) "the existence of a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved," and (3) "judgment in an amount substantially less than that claimed." *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1217 (5th Cir. 1980) (citations omitted); *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986) (citations omitted). In the case before us, Interocean has claimed damages of over two million dollars, and Samoa Gases is being held liable for substantially less than that amount, fitting

---

question directly before the court at this time.

this case into the third category. In addition, the second category has been relied on in denying prejudgment interest in cases of apportioned fault, as this weakens a plaintiff's claim that his or her funds have been withheld by a recalcitrant party. *Inland Oil and Transport Co. v. Ark-White Towing*, 696 F.2d 321, 328 (5th Cir. 1983). In *Inland Oil*, two vessels collided on the Mississippi River, and fault was found to lie 25% with Inland Oil and 75% with Ark-White and Murphy Marine. In upholding the denial of prejudgment interest, the court noted that "the decision regarding prejudgment interest will not be disturbed if it has a rational fit in the resulting judgement viewed as a whole." *Inland Oil*, 696 F.2d at 328. We think that not only does the case before us fit into the category of "peculiar facts" often alluded to, but that the denial of prejudgment interest is a rational aspect of the case as described herein.

Interocean has pointed out that the Ninth Circuit, in *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789 (9th Cir. 1980), has, in a footnote, apparently questioned the wisdom of denying prejudgment interest in cases with a high degree of contributory negligence. However, we note that in *Alkmeon*, a case referring to admiralty collisions, the court found that the only disputes were over allocation of fault and damages and both parties conceded some fault from the onset. The case was then remanded to determine whether or not special circumstances for denying prejudgment interest existed. Aside from the differences between the *Alkmeon* case and the one before us, we note that the denial of prejudgment interest is widely followed, and that the *Alkmeon* case has garnered criticism since its publication ( noted the "flaw" in *Alkmeon* and found that case did not require reexamination of the law regarding denials of prejudgment interest).

Because of the facts that (1) judgment is being rendered in an amount significantly less than claimed, and (2) our apportionment of liability finds Interocean substantially more liable than Samoa Gases, we deny any award of prejudgment interest in this case. Interocean is entitled, of course, to postjudgment interest at the rate of 6% per annum.

## CONCLUSION

Based on the principles and law enunciated above, we find the following:
(1) The degree of liability for Radiator Specialty is 0%.
(2) The degree of liability for PRI is 1%.
(3) The degree of liability for Interocean is 95%.
(4) The degree of liability for Samoa Gases is 4%.
(5) Samoa Gases is liable for the following in damages:

| | |
|---|---:|
| Lost profits | $ 0.00 |
| Maintenance and cure | 9,677.40 |
| Settlement payments | 36,300.00 |
| Damage and repair | 1,478.56 |
| Attorney's fees and costs | 0.00 |
| Prejudgment interest | 0.00 |
| Total | $ 47,455.96 |

Judgment shall enter accordingly.

It is so ordered.